# EXHIBIT 1

*(Summons and Complaint in* Shuster v. AXA Equitable Life Ins. Co.*, Superior Court of New Jersey, Law Division, Camden County, Docket No. L-4485-14, dated November 17, 2014 (D.E. 1))*

## SUMMONS

Attorney(s) <u>Lowey Dannenberg Cohen & Hart, P.C.</u>

Office Address <u>One North Broadway, Suite 509</u>

Town, State, Zip Code <u>White Plains, NY 10601</u>

Telephone Number <u>(914) 997-0500</u>

Attorney(s) for Plaintiff <u>ARLENE SHUSTER, on behalf of</u>

<u>herself and all others similarly situated</u>

Plaintiff(s)

Vs.

<u>AXA EQUITABLE LIFE INSURANCE COMPANY</u>

Defendant(s)

## Superior Court of New Jersey

<u>CAMDEN</u>         COUNTY

<u>Law</u>            DIVISION

Docket No: <u>L -4485-14</u>

## CIVIL ACTION SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/pro se/10153 deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153 deptyclerklawref.pdf.

*Michelle M. Smith*

Clerk of the Superior Court

DATED: <u>12/2/2014</u>

Name of Defendant to Be Served: <u>AXA Equitable Life Insurance Company</u>

Address of Defendant to Be Served: <u>1290 Avenue of the Americas, New York, NY 10104</u>

Revised 09/04/2012, CN 10792-English (Appendix XII-A)

# Directory of Superior Court Deputy Clerk's Offices
## County Lawyer Referral and Legal Services Offices

**ATLANTIC COUNTY:**
Deputy Clerk of the Superior Court
Civil Division, Direct Filing
1201 Bacharach Blvd., First Fl.
Atlantic City, NJ 08401

LAWYER REFERRAL
(609) 345-3444
LEGAL SERVICES
(609) 348-4200

**BERGEN COUNTY:**
Deputy Clerk of the Superior Court
Civil Division, Room 115
Justice Center, 10 Main St.
Hackensack, NJ 07601

LAWYER REFERRAL
(201) 488-0044
LEGAL SERVICES
(201) 487-2166

**BURLINGTON COUNTY:**
Deputy Clerk of the Superior Court
Central Processing Office
Attn: Judicial Intake
First Fl., Courts Facility
49 Rancocas Rd.
Mt. Holly, NJ 08060

LAWYER REFERRAL
(609) 261-4862
LEGAL SERVICES
(609) 261-1088

**CAMDEN COUNTY:**
Deputy Clerk of the Superior Court
Civil Processing Office
Hall of Justice
1st Fl., Suite 150
101 South 5th Street
Camden, NJ 08103

LAWYER REFERRAL
(856) 482-0618
LEGAL SERVICES
(856) 964-2010

**CAPE MAY COUNTY:**
Deputy Clerk of the Superior Court
9 N. Main Street
Cape May Court House, NJ 08210

LAWYER REFERRAL
(609) 463-0313
LEGAL SERVICES
(609) 465-3001

**CUMBERLAND COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
60 West Broad Street
P.O. Box 10
Bridgeton, NJ 08302

LAWYER REFERRAL
(856) 696-5550
LEGAL SERVICES
(856) 691-0494

**ESSEX COUNTY:**
Deputy Clerk of the Superior Court
Civil Customer Service
Hall of Records, Room 201
465 Dr. Martin Luther King Jr. Blvd.
Newark, NJ 07102

LAWYER REFERRAL
(973) 622-6204
LEGAL SERVICES
(973) 624-4500

**GLOUCESTER COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
Attn: Intake
First Fl., Court House
1 North Broad Street
Woodbury, NJ 08096

LAWYER REFERRAL
(856) 848-4589
LEGAL SERVICES
(856) 848-5360

**HUDSON COUNTY:**
Deputy Clerk of the Superior Court
Superior Court, Civil Records Dept.
Brennan Court House--1st Floor
583 Newark Ave.
Jersey City, NJ 07306

LAWYER REFERRAL
(201) 798-2727
LEGAL SERVICES
(201) 792-6363

**HUNTERDON COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
65 Park Avenue
Flemington, NJ 08822

LAWYER REFERRAL
(908) 236-6109
LEGAL SERVICES
(908) 782-7979

**MERCER COUNTY:**
Deputy Clerk of the Superior Court
Local Filing Office, Courthouse
175 S. Broad Street, P.O. Box 8068
Trenton, NJ 08650

LAWYER REFERRAL
(609) 585-6200
LEGAL SERVICES
(609) 695-6249

**MIDDLESEX COUNTY:**
Deputy Clerk of the Superior Court,
Middlesex Vicinage
2nd Floor - Tower
56 Paterson Street, P.O. Box 2633
New Brunswick, NJ 08903-2633

LAWYER REFERRAL
(732) 828-0053
LEGAL SERVICES
(732) 249-7600

**MONMOUTH COUNTY:**
Deputy Clerk of the Superior Court
Court House
P.O. Box 1269
Freehold, NJ 07728-1269

LAWYER REFERRAL
(732) 431-5544
LEGAL SERVICES
(732) 866-0020

**MORRIS COUNTY:**
Morris County Courthouse
Civil Division
Washington and Court Streets
P. O. Box 910
Morristown, NJ 07963-0910

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 285-6911

**OCEAN COUNTY:**
Deputy Clerk of the Superior Court
118 Washington Street, Room 121
P.O. Box 2191
Toms River, NJ 08754-2191

LAWYER REFERRAL
(732) 240-3666
LEGAL SERVICES
(732) 341-2727

**PASSAIC COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
Court House
77 Hamilton Street
Paterson, NJ 07505

LAWYER REFERRAL
(973) 278-9223
LEGAL SERVICES
(973) 523-2900

**SALEM COUNTY:**
Deputy Clerk of the Superior Court
Attn:  Civil Case Management Office
92 Market Street
Salem, NJ 08079

LAWYER REFERRAL
(856) 935-5629
LEGAL SERVICES
(856) 691-0494

**SOMERSET COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
P.O. Box 3000
40 North Bridge Street
Somerville, N.J. 08876

LAWYER REFERRAL
(908) 685-2323
LEGAL SERVICES
(908) 231-0840

**SUSSEX COUNTY:**
Deputy Clerk of the Superior Court
Sussex County Judicial Center
43-47 High Street
Newton, NJ 07860

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 383-7400

**UNION COUNTY:**
Deputy Clerk of the Superior Court
1st Fl., Court House
2 Broad Street
Elizabeth, NJ 07207-6073

LAWYER REFERRAL
(908) 353-4715
LEGAL SERVICES
(908) 354-4340

**WARREN COUNTY:**
Deputy Clerk of the Superior Court
Civil Division Office
Court House
413 Second Street
Belvidere, NJ 07823-1500

LAWYER REFERRAL
(908) 859-4300
LEGAL SERVICES
(908) 475-2010

LOWEY DANNENBERG COHEN & HART, P.C.
Sung-Min Lee, New Jersey Bar No. 025562008
Barbara J. Hart    (*pro hac vice* forthcoming)
David C. Harrison (*pro hac vice* forthcoming)
One North Broadway, Suite 509
White Plains, NY 10601
Tel:    (914) 997-0500
Fax:    (914) 997-0035

*Attorneys for Plaintiff Arlene Shuster*

FILED

NOV 17 2014

| | |
|---|---|
| ARLENE SHUSTER, on behalf of herself and all others similarly situated,<br><br>             Plaintiff,<br><br>    - against -<br><br>AXA EQUITABLE LIFE INSURANCE COMPANY,<br>              Defendant. | SUPERIOR COURT OF NEW JERSEY CAMDEN COUNTY<br><br>CIVIL PART – LAW DIVISION<br>NO.: *L-4485-14*<br><br>CLASS ACTION COMPLAINT, JURY DEMAND, AND DESIGNATION OF TRIAL COUNSEL |

Plaintiff Arlene Shuster ("Shuster" or "Plaintiff"), by her attorneys, for her complaint, alleges upon knowledge as to her own acts and upon information and belief as to all other matters as follows:

### Summary of Claim

1.    This class action alleges a breach of contract by defendant AXA Equitable Life Insurance Company ("AXA" or "Defendant") with respect to AXA's variable life insurance policy (the "Contract") held by Plaintiff and other policyholders. For the reasons set forth below, AXA breached express provisions of the Contract when it implemented a volatility-management strategy in its Separate Accounts in violation of N.Y. Ins. Law §4240(e).

2.    Plaintiff brings this action as a class action on behalf of herself and all other variable life insurance policyholders who allocated funds from their Policy Accounts (as defined

herein) to investments in Separate Accounts that were subjected to the volatility-management strategy, and who suffered injury as a result thereof (the "Class").

## Parties

3.    Plaintiff Arlene Shuster ("Shuster") is a resident of Cherry Hill, New Jersey. On February 26, 1993, Plaintiff purchased a Flexible Premium Variable Life Insurance Policy called "Incentive Life 2000" from Equitable Variable Life Insurance Company ("EVLIC"). A true and correct copy of the Contract is attached hereto as Exhibit A.

4.    Shuster initially paid a premium of $100,000. In March 1994, she made a subsequent premium payment of $100,000.

5.    As of January 1, 1997, EVLIC was merged into the Equitable Life Assurance Society of the United States, which changed its name to AXA Equitable Life Insurance Company on September 7, 2004.

6.    Defendant AXA is organized under New York law with its principal place of business located at 1290 Avenue of the Americas, New York, New York 10104. It is authorized to write life insurance, annuities, and accident and health insurance, and is licensed to transact business in all 50 states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, and Canada.

7.    AXA is sued in its own right and as successor by merger to the obligations of EVLIC.

## Venue

8.    Venue is proper in this Court because Plaintiff resides in this County, and Defendant conducts business in this County.

**Substantive Allegations**

**A.    The Variable Life Insurance Policy**

9.      AXA sells variable life insurance products.  In addition to paying a death benefit, variable life insurance allows the policyholder to allocate a portion of the premium dollars for investment.

10.     Specifically, plaintiff's variable life insurance policy allows her to:

    a.  Increase or decrease the face amount of insurance;

    b.  Make premium payments at any time and in any amount;

    c.  Change the death benefit option;

    d.  Change the allocation of net premiums and deductions among investment options; and

    e.  Transfer amounts among investment options.

    f.  Withdraw account funds under certain conditions.

11.     The premiums that the policyholder pays are placed into the policyholder's Policy Account after deductions for expenses such as taxes, premium charges, and administrative expenses.

12.     At the policyholder's direction, the net amount in the Policy Account is allocated to the Guaranteed Interest Division ("GID") and/or to the Separate Account.

13.     Funds in the GID earn interest at a guaranteed rate that AXA declares each year, which must not be less than 4% a year.  The principal in the GID is also guaranteed.

14.     The Contract states that a Separate Account consists of investment divisions. Each division may invest its assets in separate class (or series) of shares of a designated investment company.  Each class represents a separate portfolio in the investment company.

15.    The Contract states that each investment division invests "in securities and other investments whose value is subject to market fluctuations and investment risk. There is no guarantee of principal or investment experience."

16.    Under the Contract, a specified death benefit is payable to the beneficiary upon policyholder's death. In the alternative, insurance is payable to the policyholder on the policy anniversary nearest the policyholder's 100th birthday. Plaintiff's current death benefit is $1.0 million.

## AXA Breached the Contract in Implementing the Volatility-Management Strategy

17.    In 2009, 2010, and 2011, AXA began implementing a volatility-management strategy in certain investment funds (the "Affected Funds") offered to Plaintiff and other holders of variable life insurance.

18.    For example, on April 20, 2009, Shuster transferred out of several funds she held and reallocated the proceeds, to different funds in AXA's Separate Account, including: (i) EQ/Equity Growth PLUS; (ii) EQ/Mid Cap Value PLUS; and (iii) EQ/PIMCO Ultra Short Bond.

19.    In 2010, AXA implemented the volatility-management strategy to the three referenced funds and other Affected Funds.

20.    Plaintiff's Contract provides that AXA would comply with all applicable laws, including New York law in operating the Separate Account and investment divisions comprising the Separate Account.

21.    The Contract contains a section titled "Our Separate Account (SA)." In that section, AXA represented that "[AXA] established [Separate Account FP] and [AXA] maintain[s] it under the laws of New York State."

22.    The section also provides under the heading "Investment Divisions" that:

- "If required by law or regulation, the investment policy of an investment division of our [Separate Account] will not be changed by us unless approved by the Superintendent of Insurance of New York State or deemed approved in accordance with such law or regulation"; and

- "We will not make any material change in the investment policy of an investment division of our [Separate Account] without the prior approval of the Superintendent of Insurance of New York State."

23.    The Contract also provides, "The rights conferred by this policy are in addition to those provided by applicable Federal and State laws and regulations."

24.    N.Y. Insurance Law § 4240(e) governs where an insurer seeks to change the investment policies in a Separate Account. That provision states, in pertinent part:

> No authorized insurer shall make any such agreement in this state providing for the allocation of amounts to a separate account until such insurer has filed with the superintendent a statement as to its methods of operation of such separate account and the superintendent has approved such statement. ... If the insurer files an amendment of any such statement [as to its methods of operation of such separate account] with the superintendent [of insurance] that does not change the investment policy of a separate account and the superintendent does not approve or disapprove such amendment within a period of thirty days after such filing, such amendment shall be deemed to be approved as of the end of such thirty day period, except that if the superintendent requests further information on the statement during such period from the insurer, such period shall be extended until thirty days after the day on which the superintendent receives such information. An amendment of any such statement that changes the investment policy of a separate account shall be treated as an original filing. (emphasis added)

25.    Thus, where an insurer like AXA seeks to amend a statement of "its methods and operations" of a "separate account," the statute distinguishes amendments depending on whether the proposed amendment "change[s] the investment policy of a separate account." If the proposed amendment does not change the investment policy, it "shall be deemed to be approved" 30 days after the insurer files it. On the other hand, an amendment that does change the

investment policy will not be deemed to be approved, but rather "shall be treated as an original filing."

26.     Under §4240(e) and the Contract, AXA has no authority to introduce an amendment that changes the investment policy in the Separate Account or investment divisions in the Separate Account without properly obtaining approval by the Superintendent of Insurance.

27.     But that is precisely what AXA did by implementing the volatility-management strategy in the Affected Funds, including those held by Plaintiff set forth in ¶19, *supra*.

28.     AXA presented the volatility-management strategy as a "routine" matter in its filing to the New York State Department of Financial Services (the "DFS").  As a result, AXA's proposed amendments for certain Separate Accounts[1] concerning the volatility-management strategy were automatically deemed approved.

29.     The DFS found that AXA violated N.Y. Ins. Law §4240(e) in connection with its implementation of the volatility-management strategy.  *See* Consent Order dated March 17, 2014, submitted herewith as Exhibit B.  Therefore, AXA breached Shuster's Contract and the contracts of all others similarly situated.

30.     AXA's implementation of the volatility-management strategy reduced the returns of the Affected Funds held by Plaintiff and the other members of the Class.

31.     The charts below demonstrate the volatility-management strategy's impact on the Affected Funds compared to benchmarks used by AXA based on a hypothetical $10,000 investment during the period of 2010 through 2012.

---

[1] Plaintiff's variable life insurance policy utilized Separate Account FP.

## Affected Fund #1: EQ/Mid Cap Value PLUS

| Year-End | Affected Fund<br>EQ/Mid Cap Value PLUS | Benchmark<br>Russell Mid Cap Value Index* |
|---|---|---|
| 2009 | $10,000 | $10,000 |
| 2010 | $12,245 | $12,475 |
| 2011 | $11,138 | $12,303 |
| 2012 | $13,211 | $14,580 |

* Russell Mid Cap Value Index is identified as the benchmark for EQ/Mid Cap Value PLUS in EQ Advisors Trust's Annual Reports for 2010, 2011, and 2012.



## Affected Fund #2: EQ/Equity Growth PLUS

| Year-End | Affected Fund<br>EQ/Equity Growth PLUS | Benchmark<br>Russell 1000 Growth Index* |
|---|---|---|
| 2009 | 10,000.00 | 10,000.00 |
| 2010 | 11,553.00 | 11,671.00 |
| 2011 | 10,866.75 | 11,979.11 |
| 2012 | 12,405.48 | 13,807.13 |

* Russell 1000 Growth Index is identified as the benchmark for EQ/Equity Growth PLUS in EQ Advisors Trust's Annual Reports for 2010, 2011, and 2012.



**Affected Fund #3: EQ/PIMCO Ultra Short Bond**

| Year-End | Affected Fund<br>EQ/PIMCO Ultra Short Bond | Benchmark<br>BOA Merrill Lynch 3-Month Treasury Bill Index* |
|---|---|---|
| 2010 | 10,000.00 | 10,000.00 |
| 2011 | 10,700.00 | 11,000.00 |
| 2012 | 10,858.36 | 11,121.00 |

   * BOA Merrill Lynch 3-Month Treasury Bill Index is identified as the benchmark
   for EQ/PIMCO Ultra Short Bond in EQ Advisors Trust's Annual Reports for 2011
   and 2012.



## Class Action Allegations

32.    This action is brought and may properly proceed as a class action, pursuant to the provisions of Rule 4:32 of the New Jersey Court Rules, on behalf of AXA variable life insurance policyholders who allocated funds from their Policy Accounts to investments in AXA's Separate Accounts, which were subsequently subjected to volatility-management strategy, and who suffered injury as a result thereof.

33.    This action is properly brought as a class action for the following reasons.

a.    The Class is so numerous that joinder of all members is impracticable.

b.    There are questions of law or fact common to the Class.

   i.    Whether the Class members have substantially uniform contracts that obligated AXA to comply with New York law in seeking to change the investment policy of any investment account;

   ii.    whether AXA breached the contract by implementing its volatility-management strategy in violation of New York law; and

   iii.    whether the Class was injured and the basis upon which damages should be calculated to compensate for the injury.

c.    Plaintiff's claim is typical of the claim of the Class.

d.    Plaintiff will fairly and adequately protect the interests of the Class.

34.    The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members.

35.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a.    the logistics and financial burden of prosecuting an action on an individual basis are so great that a policyholder has little interest in prosecuting an individual action;

b.    when the liability of defendant has been adjudicated, claims of all members of the Class can be determined by the Court;

  c. this action will result in an orderly and expeditious administration of the Class claims, foster economies of time, effort, and expense, and ensure uniformity of decisions; and

  d. this action presents no difficulties that would impede its management by the Court as a class action.

## Cause of Action
## (Breach of Contract)

36. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

37. AXA breached the terms of the variable life insurance policies held by Plaintiff and the Class by implementing the volatility-management strategy without obtaining prior approval of the N.Y. Superintendent of Insurance, in violation of N.Y. Ins. Law §4240(e).

38. Plaintiff and the other Class members have performed all of their obligations under the variable life insurance policy contracts.

39. The volatility-management strategy substantially reduced the benefits to which Plaintiff and the other members of the Class are entitled under the terms of their contracts with AXA, and Plaintiff and the members of the Class suffered damages as a result.

40. AXA is liable for the damages sustained in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment against AXA as follows:

A. determining that this action may proceed as a class action maintainable pursuant to pursuant to the provisions of Rule 4:32 of the New Jersey Court Rules;

B. awarding Plaintiff and the Class damages;

C. awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' fees, expert witness fees, and other costs; and

D. granting such other and further relief as may be just and proper.

Dated: White Plains, New York
November 13, 2014

LOWEY DANNENBERG COHEN & HART, P.C.

By: _____

Sung-Min Lee
Barbara J. Hart     (*pro hac vice* forthcoming)
David C. Harrison (*pro hac vice* forthcoming)
One North Broadway, Suite 509
White Plains, NY  10601
Tel:     (914) 997-0500
Fax:     (914) 997-0035

*Attorneys for Plaintiff Arlene Shuster*

Of Counsel:

BOLOGNESE & ASSOCIATES, LLC
Joshua H. Grabar     (*pro hac vice* forthcoming)
1500 JFK Boulevard, Suite 320
Philadelphia, PA 19102
Tel:     (215) 814-6750
Fax:     (215) 814-6764

## CERTIFICATION OF COMPLIANCE WITH R 1:38-7(c)

I certify the Confidential Personal Identifiers have been redacted from documents now submitted to the Court, and will be redacted from all documents submitted in the future in accordance with R 1:38-7(b).

Dated: November 13, 2014                     LOWEY DANNENBERG COHEN & HART, P.C.

By: _____
SUNG-MIN LEE


## JURY DEMAND PURSUANT TO R 1:8-1(B) AND R 4:35-1

Plaintiff hereby requests trial by jury as to all issues herein.

Dated: November 13, 2014                     LOWEY DANNENBERG COHEN & HART, P.C.

By: _____
SUNG-MIN LEE


## CERTIFICATION PURSUANT TO R 4:5-1

Pursuant to R 4:5-1, I hereby certify that to the best of my knowledge, information and belief, the within matter in controversy is not the subject of any other action pending in any court or arbitration proceedings, and no other action is contemplated, and that no other parties are required to be joined herein.

Dated: November 13, 2014                     LOWEY DANNENBERG COHEN & HART, P.C.

By: _____
SUNG-MIN LEE

# EXHIBIT A



# EQUITABLE

## ....POLICY CERTIFICATION....

In response to your request, a new policy has been prepared. This policy is attached and, as you can see, the policy pages are copies rather than originals. This is to certify that the policy pages attached are true and exact copies of the approved original pages in use at the time of the original issue of this policy.

Assistant Vice President

*INSURED PERSON*   ARLENE C SHUSTER

*POLICY OWNER*   ARLENE C SHUSTER

*New File 10/7/08*



**EQUITABLE**
VARIABLE LIFE INSURANCE COMPANY

*FACE AMOUNT OF INSURANCE*   $1,000,000.00

*DEATH BENEFIT*   OPTION A (SEE PAGE 6)

*POLICY NUMBER*   REDACTED

# VARIABLE LIFE INSURANCE POLICY

---

# We agree to pay the Insurance Benefit of this policy and to provide its other benefits and rights in accordance with its provisions.

This is a **Flexible Premium Variable Life Insurance Policy**. You can, within limits:
- increase or decrease the Face Amount of Insurance;
- make premium payments at any time and in any amount;
- change the death benefit option;
- change the allocation of net premiums and deductions among your investment options; and
- transfer amounts among your investment options.

All of these rights and benefits are subject to the terms and conditions of this policy. All requests for policy changes are subject to our approval and may require evidence of insurability.

We will put your net premiums into your Policy Account. You may then allocate them to one or more investment divisions of our Separate Account (SA) and to our Guaranteed Interest Division (GID).

**The portion of your Policy Account that is in an investment division of our SA will vary up or down depending on the unit value of such investment division, which in turn depends on the investment performance of the corresponding portfolio of a designated investment company. There are no minimum guarantees as to such portion of your Policy Account.**

The portion of your Policy Account that is in our GID will accumulate, after deductions, at rates of interest we determine. Such rates will not be less than 4% a year.

**The amount and duration of the death benefit may be variable or fixed as described in this policy.**

**Right to Examine Policy.** You may examine this policy and if for any reason you are not satisfied with it, you may cancel it by returning this policy with a written request for cancellation to our Administrative Office or to the Agent through whom you bought it by the 10th day after you receive it. If you do this, we will refund the premiums that were paid on this policy.

Countersignature _____

*Molly K. Heines*

Molly K. Heines, Vice President & Secretary

*Joseph J. Melone*

Joseph J. Melone, Chairman & Chief Executive Officer

**Flexible Premium Variable Life Insurance Policy.** Insurance payable upon death before Final Policy Date. Policy Account payable on Final Policy Date. Adjustable Death Benefit. Premiums may be paid while insured person is living and before the Final Policy Date. Premiums must be sufficient to keep the policy in force. Values provided by this policy are based on declared interest rates, and on the investment experience of the investment divisions of a separate account which in turn depends on the investment performance of the corresponding portfolios of investment companies. They are not guaranteed as to dollar amount. Investment options are described on Page 10. This is a non-participating policy.

No. 90-300PA

# Contents

Policy Information  3

Table of Guaranteed Maximum Cost of
Insurance Rates  4

Those Who Benefit from this Policy  5

The Insurance Benefit We Pay  5

Changing the Face Amount of Insur-
ance or the Death Benefit Option  7

The Premiums You Pay  7

Your Policy Account and How it
Works  9

Your Investment Options  9

The Value of Your Policy Account  10

The Cash Surrender Value of this
Policy  12

How a Loan Can Be Made  13

Our Separate Account (SA)  14

Our Annual Report to You  15

How Benefits are Paid  15

Other Important Information  16

### In this policy:

"We," "our," and "us" mean
Equitable Variable Life Insurance
Company.

"You" and "your" mean the
owner of this policy at the time
an owner's right is exercised.

·Unless otherwise stated, all·
references to interest in this
policy are effective annual rates
of interest.

Attained age means age on the
birthday nearest to the beginning
of the current policy year.

### Administrative Office

The address of our Administra-
tive Office is shown on Page 3.
You should send premiums and
correspondence to that address
unless instructed otherwise.

*A copy of the application for this
policy and any additional benefit
riders are at the back of this
policy.*

# INTRODUCTION

The premiums you pay, after deductions are made in accordance with the Table of Expense Charges in the Policy Information section, are put into your Policy Account. Amounts in your Policy Account are allocated at your direction to one or more investment divisions of our SA and to our GID.

The investment divisions of our SA invest·in securities and other investments whose value is subject to market fluctuations and investment risk. There is no guarantee of principal or investment experience.

Our GID earns interest at rates we declare in advance of each policy year. The rates are guaranteed for each policy year. The principal, after deductions, is also guaranteed.

The duration of life insurance coverage depends upon the amount in your Policy Account.

If death benefit Option A is in effect, the death benefit is the Face Amount of Insurance, and the amount of the death benefit is fixed except when it is a percentage of your Policy Account. If death benefit Option B-PLUS is in effect, the death benefit is the Face Amount of Insurance *plus* the amount in your Policy Account. The amount of the death benefit is variable. Under either option, the death benefit will never be less than a percentage of your Policy Account as stated on Page 6.

We make monthly deductions from·your Policy Account to cover the cost of the benefits provided by this policy and the cost of any benefits provided by riders to this policy. If you give up this policy for its Net Cash Surrender Value, reduce the Face Amount of Insurance, or if this policy ends without value at the end of the grace period, we may deduct a surrender charge from your Policy Account.

This is only a summary of what this policy provides. You should read all of it carefully. Its terms govern your rights and our obligations.

## POLICY INFORMATION

| | | |
|---|---|---|
| INSURED PERSON | ARLENE C SHUSTER | |
| POLICY OWNER | ARLENE C SHUSTER | |
| FACE AMOUNT OF INSURANCE | $1,000,000.00 | |
| DEATH BENEFIT | OPTION A (SEE PAGE 6) | |
| POLICY NUMBER | REDACTED | SEPARATE ACCOUNT FP |
| BENEFICIARY | BERNARD SHUTER, SPOUSE | |
| REGISTER DATE | FEB 26, 1993 | ISSUE AGE    48 |
| DATE OF ISSUE | FEB 26, 1993 | SEX    FEMALE |
| INSURED PERSON'S STATE OF RESIDENCE | NEW JERSEY | RATING CLASS:   NON-SMOKER |
| PARTIAL NET CASH SURRENDER VALUE WITHDRAWAL | MINIMUM WITHDRAWAL IS $500 | |
| POLICY LOAN | MINIMUM LOAN IS $500 | |
| TRANSFER | MINIMUM TRANSFER AMOUNT IS $500 | |

AN INITIAL PREMIUM PAYMENT OF $100,000.00 IS DUE ON OR BEFORE DELIVERY OF THE POLICY.

THE PLANNED PERIODIC PREMIUM OF $100,000.00 IS PAYABLE ANNUALLY.

PREMIUM PAYMENTS ARE FOR THE INSURANCE BENEFIT AND ANY ADDITIONAL BENEFIT RIDERS LISTED BELOW.

THE PREMIUM PAYMENTS SHOWN ABOVE MAY NOT BE SUFFICIENT TO CONTINUE THE POLICY AND LIFE INSURANCE COVERAGE IN FORCE TO THE FINAL POLICY DATE, WHICH IS THE POLICY ANNIVERSARY NEAREST THE INSURED PERSON'S 100TH BIRTHDAY. THE PERIOD FOR WHICH THE POLICY AND COVERAGE WILL CONTINUE IN FORCE WILL DEPEND ON: (1) THE AMOUNT, TIMING AND FREQUENCY OF PREMIUM PAYMENTS; (2) CHANGES IN THE FACE AMOUNT OF INSURANCE AND THE DEATH BENEFIT OPTIONS; (3) CHANGES IN THE INTEREST RATES CREDITED TO OUR GID AND IN THE INVESTMENT PERFORMANCE OF THE INVESTMENT DIVISIONS OF OUR SA; (4) CHANGES IN THE MONTHLY COST OF INSURANCE DEDUCTIONS FROM THE POLICY ACCOUNT FOR THIS POLICY AND ANY BENEFITS PROVIDED BY RIDERS TO THIS POLICY; AND (5) LOAN AND PARTIAL NET CASH SURRENDER VALUE WITHDRAWAL ACTIVITY.

90-300-3PA

POLICY INFORMATION CONTINUED— **REDACTED**

————TABLE OF EXPENSE CHARGES ————

**DEDUCTIONS FROM PREMIUM PAYMENTS:**

CHARGE FOR APPLICABLE TAXES (OTHER THAN TAXES DISCUSSED ON PAGE 12):

2.100% OF EACH PREMIUM PAYMENT. THIS AMOUNT IS SUBTRACTED FROM EACH PREMIUM PAYMENT. WE RESERVE THE RIGHT TO CHANGE THIS PERCENTAGE TO CONFORM TO CHANGES IN THE LAW OR IF THE INSURED PERSON CHANGES RESIDENCE.

PREMIUM CHARGE:

4.00% OF EACH PREMIUM PAYMENT. WE RESERVE THE RIGHT TO CHANGE THIS CHARGE BUT IT WILL NEVER BE MORE THAN 4%.

**DEDUCTIONS FROM YOUR POLICY ACCOUNT:**

FIRST YEAR ADMINISTRATIVE CHARGE:

$25.00 IS DEDUCTED AT THE BEGINNING OF EACH POLICY MONTH DURING THE FIRST POLICY YEAR.

SUBSEQUENT YEARS ADMINISTRATIVE CHARGE:

$5.00 IS DEDUCTED AT THE BEGINNING OF EACH POLICY MONTH DURING EACH POLICY YEAR AFTER THE FIRST POLICY YEAR. WE RESERVE THE RIGHT TO CHANGE THIS CHARGE BUT IT WILL NEVER BE MORE THAN $8.00 A MONTH. CHANGES WILL BE AS DESCRIBED IN "CHANGES IN POLICY COST FACTORS" ON PAGE 17.

FOR PARTIAL WITHDRAWAL OF NET CASH SURRENDER VALUE:

$25.00, OR 2% OF THE AMOUNT WITHDRAWN IF LESS, IS DEDUCTED WHENEVER THERE IS A PARTIAL NET CASH SURRENDER VALUE WITHDRAWAL.

FOR AN INCREASE YOU ASK FOR IN THE FACE AMOUNT OF INSURANCE:

$1.50 FOR EACH $1,000 OF INSURANCE (BUT NOT MORE THAN $240 PER INCREASE).

FOR TRANSFERS:

WE RESERVE THE RIGHT TO CHARGE UP TO $25.00 FOR EACH TRANSFER OF AMOUNTS AMONG YOUR INVESTMENT OPTIONS.

POLICY INFORMATION CONTINUED— REDACTED

——————— TABLE OF MAXIMUM SURRENDER CHARGES ————————

| BEGINNING OF POLICY YEAR | CHARGE | BEGINNING OF POLICY YEAR | CHARGE |
|---|---|---|---|
| 1 | $17,110 | 9 | $17,110 |
| 2 | 17,110 | 10 | 16,872 |
| 3 | 17,110 | 11 | 14,020 |
| 4 | 17,110 | 12 | 11,169 |
| 5 | 17,110 | 13 | 8,317 |
| 6 | 17,110 | 14 | 5,465 |
| 7 | 17,110 | 15 | 2,614 |
| 8 | 17,110 | 16 AND LATER | 0 |

A SURRENDER CHARGE WILL BE SUBTRACTED FROM YOUR POLICY ACCOUNT IF THIS POLICY IS GIVEN UP FOR ITS NET CASH SURRENDER VALUE OR IF THIS POLICY TERMINATES WITHIN THE FIRST FIFTEEN POLICY YEARS. THE MAXIMUM CHARGE IN THE FIRST POLICY MONTH OF EACH POLICY YEAR IS SHOWN IN THE TABLE ABOVE (SUBJECT TO ANY APPLICABLE LIMITATIONS IMPOSED BY THE INVESTMENT COMPANY ACT OF 1940). AFTER THE NINTH POLICY YEAR, THE MAXIMUM CHARGE IN ANY OTHER POLICY MONTH WILL BE BASED ON THE NUMBER OF POLICY MONTHS SINCE THE BEGINNING OF THE POLICY YEAR.

THIS TABLE ASSUMES NO FACE AMOUNT INCREASES. SEE PAGE 12 FOR A DESCRIPTION OF SURRENDER CHARGES FOR FACE AMOUNT INCREASES.

IF THE FACE AMOUNT OF INSURANCE IS REDUCED WITHIN THE FIRST FIFTEEN POLICY YEARS, A PRO RATA SHARE OF THE APPLICABLE SURRENDER CHARGE AT THAT TIME WILL BE DEDUCTED FROM YOUR POLICY ACCOUNT. SEE PAGE 12 FOR A DESCRIPTION OF THE PRO RATA SURRENDER CHARGE.

*****ADMINISTRATIVE OFFICE:    EQUITABLE VARIABLE LIFE INSURANCE COMPANY*****
CHARLOTTE SERVICE CENTER
6301 MORRISON BOULEVARD
CHARLOTTE, NC 28211

POLICY INFORMATION CONTINUED – REDACTED

TABLE OF GUARANTEED MAXIMUM COST OF INSURANCE RATES

GUARANTEED MAXIMUM MONTHLY RATES PER $1,000
OF NET AMOUNT AT RISK (SEE PAGE 9)

| INSURED PERSON'S ATTAINED AGE | MONTHLY RATE | INSURED PERSON'S ATTAINED AGE | MONTHLY RATE |
|---|---|---|---|
| 48 | $ 0.21417 | 83 | $ 7.98833 |
| 49 | 0.32500 | 84 | 9.02000 |
| 50 | 0.34917 | 85 | 10.16417 |
| 51 | 0.37500 | 86 | 11.40333 |
| 52 | 0.40500 | 87 | 12.74917 |
| 53 | 0.43917 | 88 | 14.19083 |
| 54 | 0.47417 | 89 | 15.75500 |
| 55 | 0.51167 | 90 | 17.44583 |
| 56 | 0.55000 | 91 | 19.30500 |
| 57 | 0.58917 | 92 | 21.39667 |
| 58 | 0.62583 | 93 | 23.84000 |
| 59 | 0.66500 | 94 | 26.92583 |
| 60 | 0.71167 | 95 | 31.31000 |
| 61 | 0.76583 | 96 | 38.50417 |
| 62 | 0.83500 | 97 | 52.27500 |
| 63 | 0.92167 | 98 | 83.33250 |
| 64 | 1.02417 | 99 | 83.33250 |
| 65 | 1.13583 | | |
| 66 | 1.25583 | | |
| 67 | 1.37750 | | |
| 68 | 1.50000 | | |
| 69 | 1.63167 | | |
| 70 | 1.78333 | | |
| 71 | 1.96583 | | |
| 72 | 2.19167 | | |
| 73 | 2.46750 | | |
| 74 | 2.79417 | | |
| 75 | 3.16417 | | |
| 76 | 3.57250 | | |
| 77 | 4.01250 | | |
| 78 | 4.48583 | | |
| 79 | 5.00583 | | |
| 80 | 5.59500 | | |
| 81 | 6.27500 | | |
| 82 | 7.06750 | | |

90-300-4                    PAGE 4

## *Those Who Benefit from this Policy*

**Owner.** The owner of this policy is the insured person unless otherwise stated in the application, or later changed.

If the insured person is living on the Final Policy Date defined in the Policy Information section, we will pay you the amount in your Policy Account on that date minus any policy loan and accrued loan interest. This policy will then end.

As the owner, you are entitled to exercise all the rights of this policy while the insured person is living. To exercise a right, you do not need the consent of anyone who has only a conditional or future ownership interest in this policy.

**Beneficiary.** The beneficiary is as stated in the application, unless later changed. The beneficiary is entitled to the Insurance Benefit of this policy. One or more beneficiaries for the Insurance Benefit can be named in the application. If more than one beneficiary is named, they can be classed as primary or contingent. If two or more persons are named in a class, their shares in the benefit can be stated. The stated shares in the Insurance Benefit will be paid to any primary beneficiaries who survive the insured person. If no primary beneficiaries survive, payment will be made to any surviving contingent beneficiaries. Beneficiaries who survive in the same class will share the Insurance Benefit equally, unless you have made another arrangement with us.

If there is no designated beneficiary living at the death of the insured person, we will pay the Insurance Benefit to the insured person's surviving children in equal shares. If none survive, we will pay the insured person's estate.

**Changing the Owner or Beneficiary.** While the insured person is living, you may change the owner or beneficiary by written notice in a form satisfactory to us. (You can get such a form from our agent or by writing to us at our Administrative Office.) The change will take effect on the date you sign the notice. But, it will not apply to any payment we make or other action we take before we receive the notice. If you change the beneficiary, any previous arrangement you made as to a payment option for benefits is cancelled. You may choose a payment option for the new beneficiary in accordance with "How Benefits Are Paid" on Page 15.

**Assignment.** You may assign this policy, if we agree. In any event, we will not be bound by an assignment unless we have received it in writing at our Administrative Office. Your rights and those of any other person referred to in this policy will be subject to the assignment. We assume no responsibility for the validity of an assignment. An absolute assignment will be considered as a change of ownership to the assignee.

## *The Insurance Benefit We Pay*

We will pay the Insurance Benefit of this policy to the beneficiary when we receive at our Administrative Office (1) proof satisfactory to us that the insured person died before the Final Policy Date; and (2) all other requirements we deem necessary before such payment may be made. The Insurance Benefit includes the following amounts, which we will determine as of the date of the insured person's death:

- the death benefit described on Page 6;

- plus any other benefits then due from riders to this policy;

- minus any policy loan and accrued loan interest;

- minus any overdue deductions from your Policy Account if the insured person dies during a grace period.

We will add interest to the resulting amount for the period from the date of death to the date of payment. We will compute the interest at a rate we determine, but not less than the greater of (a) the rate we are paying on the date of payment under the Deposit Option on Page 15, or (b) the rate required by any applicable law. Payment of the Insurance Benefit may also be affected by other provisions of this policy. See Page 17, where we specify our right to contest the policy, the suicide exclusion, and what happens if age or sex has been misstated. Special exclusions or limitations (if any) are listed in the Policy Information section.

**Death Benefit.** The death benefit at any time will be determined under either Option A or Option B-PLUS below, whichever you have chosen and is in effect at such time.

Under Option A, the death benefit is the greater of (a) the Face Amount of Insurance; or (b) a percentage (see Table 1 below) of the amount in your Policy Account. Under this option, the amount of the death benefit is fixed, except when it is determined by such a percentage.

The percentage referred to above is the percentage from the following table for the insured person's age (nearest birthday) at the beginning of the policy year of determination.

TABLE 1: OPTION A
PERCENTAGES

| Insured Person's Age | Percentage | Insured Person's Age | Percentage |
|---|---|---|---|
| 0-40 | 250% | 61 | 128% |
| 41 | 243 | 62 | 126 |
| 42 | 236 | 63 | 124 |
| 43 | 229 | 64 | 122 |
| 44 | 222 | 65 | 120 |
| 45 | 215 | 66 | 119 |
| 46 | 209 | 67 | 118 |
| 47 | 203 | 68 | 117 |
| 48 | 197 | 69 | 116 |
| 49 | 191 | 70 | 115 |
| 50 | 185 | 71 | 113 |
| 51 | 178 | 72 | 111 |
| 52 | 171 | 73 | 109 |
| 53 | 164 | 74 | 107 |
| 54 | 157 | 75-95 | 105 |
| 55 | 150 | 96 | 104 |
| 56 | 146 | 97 | 103 |
| 57 | 142 | 98 | 102 |
| 58 | 138 | 99 | 101 |
| 59 | 134 | | |
| 60 | 130 | | |

Under Option B-PLUS, the death benefit is the greater of (a) the Face Amount of Insurance *plus* the amount in your Policy Account; or (b) a percentage (see Table 2 on Page 7) of the amount in your Policy Account. Under this option the amount of the death benefit is variable.

The percentage referred to above is the percentage from the following table for the insured person's age (nearest birthday) at the beginning of the policy year of determination.

90-300-5PA

TABLE 2: OPTION B-PLUS
PERCENTAGES

| Insured Person's Age | Percentage | Insured Person's Age | Percentage |
|---|---|---|---|
| 0-40 | 250% | 61 | 128% |
| 41 | 243 | 62 | 126 |
| 42 | 236 | 63 | 124 |
| 43 | 229 | 64 | 122 |
| 44 | 222 | 65 | 120 |
| 45 | 215 | 66 | 119 |
| 46 | 209 | 67 | 118 |
| 47 | 203 | 68 | 117 |
| 48 | 197 | 69 | 116 |
| 49 | 191 | 70-85 | 115 |
| 50 | 185 | 86 | 114 |
| 51 | 178 | 87 | 113 |
| 52 | 171 | 88 | 112 |
| 53 | 164 | 89 | 111 |
| 54 | 157 | 90 | 110 |
| 55 | 150 | 91 | 109 |
| 56 | 146 | 92 | 108 |
| 57 | 142 | 93 | 107 |
| 58 | 138 | 94 | 106 |
| 59 | 134 | 95 | 105 |
| 60 | 130 | 96 | 104 |
| | | 97 | 103 |
| | | 98 | 102 |
| | | 99 | 101 |

Section 7702 of the Internal Revenue Code of 1986, as amended (i.e., the "Code"), gives a definition of life insurance which limits the amounts that may be paid into a life insurance policy relative to the benefits it provides. Even if this policy states otherwise, at no time will the "future benefits" under this policy be less than an amount such that the "premiums paid" do not exceed the Code's "guideline premium limitations". We may adjust the amount of premium paid to meet these limitations. Also, at no time will the "death benefit" under the policy be less than the "applicable percentage" of the "cash surrender value" of the policy. The above terms are as defined in the Code. In addition, we may take certain actions, described here and elsewhere in the policy, to meet the definitions and limitations in the Code, based on our interpretation of the Code. Please see "Policy Changes — Applicable Tax Law" for more information.

# Changing the Face Amount of Insurance or the Death Benefit Option

At any time after the first policy year while this policy is in force, you may change the death benefit option or the Face Amount of Insurance by written request to us at our Administrative Office, subject to our approval and the following:

1. You may ask us to increase the Face Amount of Insurance if you provide evidence satisfactory to us of the insurability of the insured person. If the Face Amount of Insurance is increased, then the cost of insurance rate for the amount of the increase will be based on the rating class of the insured person on the date of the increase, and the insured person's sex and attained age. Any increase you ask for must be at least $10,000. There is a charge for such increase that is shown in the Policy Information section. We will deduct the charge from your Policy Account as of the date the increase takes effect. Such deduction will be made in accordance with the "Allocations"

provision on Page 10. If you increase the face amount, an additional fifteen year surrender charge will apply to that increase if any or all of that increase is surrendered before the end of the fifteenth year from the effective date of increase.

2. You may ask us to reduce the Face Amount of Insurance but not to less than the minimum amount for which we would then issue this policy under our rules. Any such reduction in the Face Amount of Insurance may not be less than $10,000. If you do this before the end of the fifteenth policy year or before the end of the fifteenth year following an increase in the face amount, we will deduct from your Policy Account a pro rata share of the applicable surrender charge (see Page 12). Reductions will first be applied against the most recent increase in the Face Amount of Insurance. They will then be applied to prior increases in the Face Amount of Insurance in the reverse order in which such increases took place, and then to the original Face Amount of Insurance.

3. You can change your death benefit option. If you ask us to change from Option A to Option B-PLUS, we will decrease the Face Amount of Insurance by the amount in your Policy Account on the date the change takes effect. However, we reserve the right to decline to make such change if it would reduce the Face Amount of Insurance below the minimum amount for which we would then issue this policy under our rules. If you ask us to change from Option B-PLUS to Option A, we will increase the Face Amount of Insurance by the amount in your Policy Account on the date the change takes effect. Such decreases and increases in the Face Amount of Insurance are made so that the death benefit remains the same on the date the change takes effect. However, if your death benefit is determined by a percentage multiple of the Policy Account, there may be an increase in the death benefit. If so, we will require evidence of insurability to make the change.

4. The change will take effect at the beginning of the policy month that coincides with or next follows the date we approve your request.

5. We reserve the right to decline to make any change that we determine would cause this policy to fail to qualify as life insurance under applicable tax law as interpreted by us (see Page 16).

6. You may ask for a change by completing an application for change, which you can get from our agent or by writing to us at our Administrative Office. A copy of your application for change will be attached to the new Policy Information section that we will issue when the change is made. The new section and the application for change will become a part of this policy. We may require you to return this policy to our Administrative Office to make a policy change.

## *The Premiums You Pay*

The initial premium payment shown in the Policy Information section is due on or before delivery of this policy. No insurance will take effect before the initial premium payment is paid. Other premiums may be paid at any time while this policy is in force and before the Final Policy Date at our Administrative Office or premium collection office.

We will send premium notices to you for the planned periodic premium shown in the Policy Information section. You may skip planned periodic premium payments. However, this may adversely affect the duration of the death benefit and your policy's values.

**Limits.** Each premium payment after the initial one must be at least $100. We may increase this minimum limit 90 days after we send you written notice of such increase. We reserve the right to limit the amount of any premium payments you may make which are in addition to the planned periodic premium payments.

We also reserve the right not to accept premium payments (in a policy year) that we determine would cause this policy to fail to qualify as life insurance under applicable tax law as interpreted by us (see Page 16).

**Grace Period.** The duration of insurance coverage depends upon the Net Cash Surrender Value being sufficient to cover the total monthly deductions described on Page 9. If the Net Cash Surrender Value at the beginning of any policy month is less than such deductions for that month, we will send a written notice to you and any assignee on our records at last known addresses stating that a grace period of 61 days has begun, starting with the beginning of that policy month. The notice will also

state the amount of payment which would increase the Net Cash Surrender Value sufficiently to cover total monthly deductions for 3 months, if no interest or investment performance were credited to or charged against the Policy Account and no policy changes were made.

If we do not receive such amount at our Administrative Office before the end of the grace period, we will then (1) withdraw and retain the entire amount in your Policy Account, including any applicable surrender charge; and (2) send a written notice to you and any assignee on our records at last known addresses stating that this policy has ended without value.

If we do receive the requested amount before the end of the grace period, but the Net Cash Surrender Value is still insufficient to cover total monthly deductions, we will send a written notice that a new 61-day grace period has begun and request an additional payment.

If the insured person dies during a grace period, we will pay the Insurance Benefit as described on Page 6.

**Restoring Your Policy Benefits.** If this policy has ended without value, you may restore policy benefits while the insured person is alive if you:

1.  Ask for restoration of policy benefits within 3 years from the end of the grace period; and

2.  Provide evidence of insurability satisfactory to us; and

3.  Make a payment of an amount sufficient to cover (i) total monthly deductions for 3 months, calculated from the effective date of restoration; and (ii) the charge for applicable taxes, the premium charge, and any increase in surrender charges associated with this payment. We will determine the amount of this required payment as if no interest or investment performance were credited to or charged against your Policy Account.

The effective date of the restoration of policy benefits will be the beginning of the policy month which coincides with or next follows the date we approve your request.

From the required payment we will deduct the charge for applicable taxes and the premium charge. The policy account on the date of restoration will be equal to the balance of the required payment plus a surrender charge credit. The surrender charge credit will be the surrender charge applicable at the beginning of the grace period, but not greater than the maximum surrender charge as of the effective date of restoration.

We will start to make monthly charges again as of the effective date of restoration.

## *Your Policy Account and How it Works*

**Premium Payments.** When we receive your premium payments, we subtract the expense charges shown in the table in the Policy Information section. We put the balance (the net premium) into your Policy Account as of the date we receive the premium payment at our Administrative Office, and before any deductions from your Policy Account due on that date are made. However, we will put the initial net premium payment into your Policy Account as of the Register Date if it is later than the date of receipt. No premiums will be applied to your Policy Account until the full initial premium payment, as shown on your application, is received at our Administrative Office.

**Monthly Deductions.** At the beginning of each policy month we make a deduction from your Policy Account to cover monthly administrative charges and to provide insurance coverage, subject to the Grace Period provision above. Such deduction for any policy month is the sum of the following amounts determined as of the beginning of that month:

•   the monthly administrative charges;

•   the monthly cost of insurance for the insured person;

•   the monthly cost of any benefits provided by riders to this policy.

The monthly cost of insurance is the sum of a) our current monthly cost of insurance rate times the net amount at risk at the beginning of the policy month divided by $1,000; *plus* b) any extra charge per $1,000 of Face Amount of Insurance shown in the Policy Information section, times the Face

Amount of Insurance at the beginning of the policy month divided by $1,000. The net amount at risk at any time is the death benefit minus the amount in your Policy Account at that time. The cost of insurance rate is based on the face amount of insurance and on the sex, attained age, rating class, and smoker or non-smoker status of the insured person.

We will determine cost of insurance rates from time to time. Any change in the cost of insurance rates we use will be as described in "Changes in Policy Cost Factors" on Page 17. They will never be more than those shown in the Table of Guaranteed Maximum Cost of Insurance Rates on Page 4.

**Other Deductions.** We also make the following other deductions from your Policy Account as they occur:

- We deduct a withdrawal charge if you make a partial withdrawal of the Net Cash Surrender Value (see Page 13).
- We deduct a surrender charge if, before the end of the fifteenth policy year, you give up this policy for its Net Cash Surrender Value, you reduce the Face Amount of Insurance, or if this policy terminates without value at the end of a grace period (see Page 12). A surrender charge will also apply to such transactions for up to fifteen years following a face amount increase.
- We deduct a charge if you increase the Face Amount of Insurance (see Page 7).
- We deduct a charge for certain transfers (see Page 10).

# *Your Investment Options*

**Allocations.** This policy provides investment options for the amount in your Policy Account. Amounts put into your Policy Account and deductions from it are allocated to the investment divisions of our SA and to the unloaned portion of our GID at your direction. You specified your initial premium allocation and deduction allocation percentages in your application for this policy, a copy of which is attached to this policy. Unless you change them, such percentages shall also apply to subsequent premium and deduction allocations. However, any amounts which are put into your Policy Account prior to the Allocation Date and which are to be allocated to the investment divisions of our SA will initially be allocated to (and monthly deductions taken from) the Money Market Division of our SA. The Allocation Date is the first business day (see Page 12) twenty calendar days after the date of issue of this policy. On the Allocation Date, any such amounts then in the Money Market Division will be allocated in accordance with the directions contained in your policy application.

Allocation percentages must be zero or a whole number not greater than 100. The sum of the premium allocation percentages and of the deduction allocation percentages must each equal 100.

You may change such allocation percentages by written notice to our Administrative Office. A change will take effect on the date we receive it at our Administrative Office except for changes received on or prior to the Allocation Date which will take effect on the first business day following the Allocation Date.

If we cannot make a monthly deduction on the basis of the deduction allocation percentages then in effect, we will make that deduction based on the proportion that your unloaned value in our GID and your values in the investment divisions of our SA bear to the total unloaned value in your Policy Account.

**Transfers.** At your written request to our Administrative Office, we will transfer amounts from your value in any investment division of our SA to one or more other divisions of our SA or to our GID. Any such transfer will take effect on the date we receive your written request for it at our Administrative Office.

Once during each policy year you may ask us by written request to our Administrative Office to transfer an amount you specify from your unloaned value in our GID to one or more investment divisions of our SA. However, we will make such a transfer only if (1) we receive your written request at our Administrative Office within 30 days before or after a policy anniversary; and (2) the amount you specify is not more than the greater of 25% of your unloaned value in our GID as of the date the transfer takes effect or the minimum transfer amount shown on Page 3. In no event will we transfer more than your unloaned value in our GID. The transfer will take effect on the date we receive your written request for it at our Administrative Office but not before the policy anniversary.

The minimum amount that we will transfer from your value in an investment division of our SA on any date is the lesser of the minimum transfer amount shown on Page 3 or your value in that investment division on that date, except as stated in the next paragraph. The minimum amount that we will transfer from your value in our GID is the lesser of the minimum transfer amount shown on Page 3 or your unloaned value in our GID as of the date the transfer takes effect, except as stated in the next paragraph.

We will waive the minimum amount limitations set forth in the immediately preceding paragraph if the *total* amount being transferred on that date is at least the minimum transfer amount shown on Page 3.

We reserve the right to make a transfer charge up to the amount shown on Page 3. The transfer charge, if any, is deducted from the amounts transferred from the investment divisions of our SA and the GID based on the proportion that the amount transferred from each investment division and the GID bears to the total amount being transferred. A transfer from the Money Market Division on the Allocation Date (if applicable) will not incur a transfer charge.

If you ask us to transfer the entire amount of your value in the investment divisions of our SA to our GID, we will not make a charge for that transfer.

## *The Value of Your Policy Account*

The amount in your Policy Account at any time is equal to the sum of the amounts you then have in our GID and the investment divisions of our SA under this policy.

**Your Value in our Guaranteed Interest Division (GID).** The amount you have in our GID at any time is equal to the amounts allocated and transferred to it, plus the interest credited to it, minus amounts deducted, transferred and withdrawn from it.

We will credit the amount in our GID with interest rates we determine. We will determine such interest rates annually in advance for unloaned and loaned amounts in our GID. The rates may be different for unloaned and loaned amounts. The interest rates we determine each year will apply to the policy year that follows the date of determination. Any change in the interest rates we determine will be as described in "Changes in Policy Cost Factors" on Page 17. Such interest rates will not be less than 4%.

At the end of each policy month we will credit interest on unloaned amounts in our GID as follows:

- On amounts that remain in our GID for the entire policy month, from the beginning to the end of the policy month.

- On amounts allocated to our GID during a policy month that are net premium payments or loan repayments, from the date we receive them to the end of the policy month. However, we will credit interest on the amount derived from the initial premium payment from the Register Date, if it is later than the date of receipt.

- On amounts transferred to our GID during a policy month, from the date of the transfer to the end of the policy month.

- On amounts deducted or withdrawn from our GID during a policy month, from the beginning of the policy month to the date of the deduction or withdrawal.

We credit interest on the loaned portion of our GID on each policy anniversary and at any time you repay all of a policy loan. At the time of crediting such interest, we allocate the interest to the investment divisions and the unloaned portion of our GID in accordance with your premium allocation percentage.

**Your Value in the Investment Divisions of our Separate Account (SA).** The amount you have in an investment division of our SA under this policy at any time is equal to the number of units this policy then has in that division multiplied by the division's unit value at that time.

Amounts allocated, transferred or added to an investment division of our SA are used to purchase units of that division; units are redeemed when amounts are deducted, loaned, transferred or withdrawn. These transactions are called policy transactions.

90-300-11PA                                                                 Page 11

The number of units a policy has in an investment division at any time is equal to the number of units purchased minus the number of units redeemed in that division to that time. The number of units purchased or redeemed in a policy transaction is equal to the dollar amount of the policy transaction divided by the division's unit value on the date of the policy transaction. Policy transactions may be made on any day. The unit value that applies to a transaction made on a business day will be the unit value for that day. The unit value that applies to a transaction made on a non-business day will be the unit value for the next business day.

We determine unit values for the investment divisions of our SA at the end of each business day. Generally, a business day is any day we are open and the New York Stock Exchange is open for trading. A business day immediately preceded by one or more non-business calendar days will include those non-business days as part of that business day. For example, a business day which falls on a Monday will consist of that Monday and the immediately preceding Saturday and Sunday.

The unit value of an investment division of our SA on any business day is equal to the unit value for that division on the immediately preceding business day multiplied by the net investment factor for that division on that business day.

The net investment factor for an investment division of our SA on any business day is (a) divided by (b), minus (c), where:

(a) is the net asset value of the shares in designated investment companies that belong to the investment division at the close of business on such business day before any policy transactions are made on that day, plus the amount of any dividend or capital gain distribution paid by the investment companies on that day;

(b) is the value of the assets in that investment division at the close of business on the immediately preceding business day after all policy transactions were made for that day; and

(c) is a charge for each calendar day in that business day, as defined above, corresponding to a charge not exceeding .70% yearly for mortality and expense risks, plus any charge for that day for taxes or amounts set aside as a reserve for taxes.

The net asset value of an investment company's shares held in each investment division shall be the value reported to us by that investment company.

## *The Cash Surrender Value of this Policy*

**Cash Surrender Value.** The Cash Surrender Value on any date is equal to the amount in your Policy Account on that date minus any surrender charge.

**Net Cash Surrender Value.** The Net Cash Surrender Value is equal to the Cash Surrender Value minus any policy loan and accrued loan interest. You may give up this policy for its Net Cash Surrender Value at any time while the insured person is living. You may do this by sending us a written request for it and this policy to our Administrative Office. We will compute the Net Cash Surrender Value as of the date we receive your request for it and this policy at our Administrative Office. All insurance coverage under this policy ends on such date.

**Surrender Charges.** If you give up this policy for its Net Cash Surrender Value or if it ends without value at the end of a grace period before the end of the fifteenth policy year, we will subtract a surrender charge from your Policy Account. A table of maximum surrender charges is in the Policy Information section.

We will also establish surrender charges for any increase in the Face Amount of Insurance that represents an increase over the previous highest Face Amount. These will apply before the end of the fifteenth year from the effective date of the increase. Changes in Face Amount resulting from a change in death benefit option will not be considered in computing the previous highest Face Amount.

If the Face Amount of Insurance is reduced before the end of the fifteenth policy year or within fifteen years following a face amount increase, we will also deduct a proportionate amount of any applicable surrender charge from your Policy Account. Such deduction will be made in accordance with the "Allocations" provision on Page 10. Reductions will first be applied against the most recent

increase in the Face Amount of Insurance. They will then be applied to prior increases in the Face Amount of Insurance in the reverse order in which such increases took place, and then to the original Face Amount of Insurance.

If there is an increase or reduction in the surrender charge shown on Page 3, we will send you a new table showing the revised surrender charges. We have filed a detailed statement of the method of computing surrender charges with the insurance supervisory official of the jurisdiction in which this policy is delivered.

**Partial Net Cash Surrender Value Withdrawal.** After the first policy year and while the insured person is living, you may ask for a partial Net Cash Surrender Value withdrawal by written request to our Administrative Office. Your request will be subject to our approval based on our rules in effect when we receive your request, and to the minimum withdrawal amount shown in the Policy Information section. The amount withdrawn from the Policy Account is equal to the amount requested plus the expense charge shown in the Table of Expense Charges in the Policy Information section. We have the right to decline a request for a partial Net Cash Surrender Value withdrawal (See Policy Changes — Applicable Tax Law on Page 16). A partial withdrawal will result in a reduction in the Cash Surrender Value and in your Policy Account equal to the amount withdrawn as well as a reduction in your death benefit. If the death benefit is Option A, the withdrawal may also result in a decrease in the face amount.

You may tell us how much of each partial withdrawal is to come from your unloaned value in our GID and from your values in each of the investment divisions of our SA. If you do not tell us, we will make the withdrawal on the basis of your monthly deduction allocation percentages then in effect. The expense charge is deducted from your value remaining in each investment division and the GID, from whichever the withdrawal is made, based on the proportion that the amount withdrawn from each investment division and the GID bears to the total amount being withdrawn. If we cannot make the withdrawal or deduct the expense charge as indicated above, we will make the withdrawal and deduction based on the proportion that your unloaned value in our GID and your values in the investment divisions of our SA bear to the total unloaned value in your Policy Account.

Such withdrawal and resulting reduction in the death benefit, in the Cash Surrender Value and in your Policy Account will take effect on the date we receive your written request for it at our Administrative Office. We will send you a new Policy Information section if a withdrawal results in a reduction in the Face Amount of Insurance. It will become a part of this policy. We may require you to return this policy to our Administrative Office to make a change.

## How a Loan Can Be Made

**Policy Loans.** You can get a loan on this policy while it has a loan value. This policy will be the only security for the loan. The initial loan and each additional loan must be for at least the minimum loan amount shown in the Policy Information section. Any amount on loan is part of your Policy Account (see Page 11). We refer to this as the loaned portion of your Policy Account.

**Loan Value.** The loan value on any date is 90% of the Cash Surrender Value on that date.

The amount of the loan may not be more than the loan value. If you request an increase to an existing loan, the additional amount requested will be added to the amount of the existing loan and accrued loan interest.

Your request for a policy loan must be in writing to our Administrative Office. You may tell us how much of the requested loan is to be allocated to your unloaned value in our GID and your value in each investment division of our SA. Such values will be determined as of the date we receive your request. If you do not tell us, we will allocate the loan on the basis of your monthly deduction allocation percentages then in effect. If we cannot allocate the loan on the basis of your direction or those percentages, we will allocate it based on the proportion that your unloaned value in our GID and your values in the investment divisions of our SA bear to the total unloaned value in your Policy Account.

The loaned portion of your Policy Account will be maintained as a part of our GID. Thus, when a loaned amount is allocated to an investment division of our SA, we will redeem units of that investment division sufficient in value to cover the amount of the loan so allocated and transfer that amount to our GID.

**Loan Interest.** Interest on a loan accrues daily at an adjustable loan interest rate. We will determine the rate at the beginning of each policy year, subject to the following paragraphs. It will apply to any new or outstanding loan under the policy during the policy year next following the date of determination.

The maximum loan interest rate for a policy year shall be the greater of: (1) the "Published Monthly Average," as defined below, for the calendar month that ends two months before the date of determination; or (2) 5%. "Published Monthly Average" means the Monthly Average Corporates yield shown in Moody's Corporate Bond Yield Averages published by Moody's Investors Service, Inc., or any successor thereto. If such averages are no longer published, we will use such other averages as may be established by regulation by the insurance supervisory official of the jurisdiction in which this policy is delivered. In no event will the loan interest rate for a policy year be greater than the maximum rate permitted by applicable law. We reserve the right to establish a rate lower than the maximum.

No change in the rate shall be less than $\frac{1}{2}$ of 1% a year. We may increase the rate whenever the maximum rate as determined by clause (1) of the preceding paragraph increases by $\frac{1}{2}$ of 1% or more. We will reduce the rate to or below the maximum rate as determined by clause (1) of the preceding paragraph if such maximum is lower than the rate being charged by $\frac{1}{2}$ of 1% or more.

We will notify you of the initial loan interest rate when you make a loan. We will also give you advance written notice of any increase in the interest rate of any outstanding loan.

Loan interest is due on each policy anniversary. If the interest is not paid when due, it will be added to your outstanding loan and allocated on the basis of the deduction allocation percentages then in effect. If we cannot make the allocation on the basis of these percentages, we will make it based on the proportion that your unloaned value in our GID and your values in the investment divisions of our SA bear to the total unloaned value in your Policy Account. The unpaid interest will then be treated as part of the loaned amount and will bear interest at the loan rate.

When unpaid loan interest is allocated to an investment division of our SA, we will redeem units of that investment division sufficient in value to cover the amount of the interest so allocated and transfer that amount to our GID.

**Loan Repayment.** You may repay all or part of a policy loan at any time while the insured person is alive and this policy is in force. We will assume that any payment you make to us while you have a loan and your policy is not in grace is a loan repayment, unless you tell us in writing that it is a premium payment.

Repayments will first be allocated to our GID until you have repaid any loaned amounts that were allocated to our GID. You may tell us how to allocate payments above that amount among our GID and the investment divisions of our SA. If you do not tell us, we will make the allocation on the basis of the premium allocation percentages then in effect.

Failure to repay a policy loan or to pay loan interest will not terminate this policy unless at the beginning of a policy month the Net Cash Surrender Value is less than the total monthly deduction then due. In that case, the Grace Period provision will apply (see Page 8).

A policy loan will have a permanent effect on your benefits under this policy even if it is repaid.

## *Our Separate Account (SA)*

The Separate Account is our Separate Account (SA) shown on Page 3. We established it and we maintain it under the laws of New York State. Realized and unrealized gains and losses from the assets of our SA are credited or charged against it without regard to our other income, gains, or losses. Assets are put in our SA to support this policy and other variable life insurance policies. Assets may be put in our SA for other purposes, but not to support contracts or policies other than variable contracts.

The assets of our SA are our property. The portion of its assets equal to the reserves and other policy liabilities with respect to our SA will not be chargeable with liabilities arising out of any other business we conduct. We may transfer assets of an investment division in excess of the reserves and other liabilities with respect to that division to another investment division or to our General Account.

**Investment Divisions.** Our SA consists of investment divisions. Each division may invest its assets in a separate class of shares of a designated investment company or companies. The investment divisions of our SA that you chose for your initial allocations are shown on the application for this

90-300-13PA                                                                                      Page 14

policy, a copy of which is attached to this policy. We may from time to time make other investment divisions available to you. We will provide you with written notice of all material details including investment objectives and all charges.

We have the right to change or add designated investment companies. We have the right to add or remove investment divisions. We have the right to withdraw assets of a class of policies to which this policy belongs from an investment division and put them in another investment division. We also have the right to combine any two or more investment divisions. The term investment division in this policy shall then refer to any other investment division in which the assets of a class of policies to which this policy belongs were placed.

We have the right to:

1. register or deregister the Separate Account under the Investment Company Act of 1940;

2. run the Separate Account under the direction of a committee, and discharge such committee at any time;

3. restrict or eliminate any voting rights of policy owners, or other persons who have voting rights as to the Separate Account; and

4. operate the Separate Account or one or more of the investment divisions by making direct investments or in any other form. If we do so, we may invest the assets of the Separate Account or one or more of the investment divisions in any legal investments. We will rely upon our own or outside counsel for advice in this regard. Also, unless otherwise required by law or regulation, an investment adviser or any investment policy may not be changed without our consent. If required by law or regulation, the investment policy of an investment division of our SA will not be changed by us unless approved by the Superintendent of Insurance of New York State or deemed approved in accordance with such law or regulation. If so required, the process for getting such approval is on file with the insurance supervisory official of the jurisdiction in which this policy is delivered.

If any of these changes result in a material change in the underlying investments of an investment division of our SA, we will notify you of such change, as required by law. We will not make any material change in the investment policy of an investment division of our SA without the prior approval of the Superintendent of Insurance of New York State. The process for getting such approval is on file with the Pennsylvania Insurance Commissioner. If you have value in that investment division, if you wish, we will transfer it at your written direction from that division (without charge) to another division of our SA or to our GID, and you may then change your premium and deduction allocation percentages.

## *Our Annual Report to You*

For each policy year we will send you a report for this policy that shows the current death benefit, the value you have in our GID and the value you have in each investment division of our SA, the Cash Surrender Value and any policy loan with the current loan interest rate. It will also show the premiums paid and any other information as may be required by the insurance supervisory official of the jurisdiction in which this policy is delivered.

## *How Benefits Are Paid*

You can have the Insurance Benefit, your Net Cash Surrender Value withdrawals or your Policy Account payable on the Final Policy Date paid immediately in one sum. Or, you can choose another form of payment for all or part of them. If you do not arrange for a specific choice before the insured person dies, the beneficiary will have this right when the insured person dies. If you do make an arrangement, however, the beneficiary cannot change it after the insured person dies.

*Payments under the following options will not be affected by the investment experience of any investment division of our SA after proceeds are applied under such options.*

The options are:

1. **Deposit:** The sum will be left on deposit for a period mutually agreed upon. We will pay interest at the end of every month, every 3 months, every 6 months or every 12 months, as chosen.

2. **Installment Payments:** There are two ways that we pay installments:

90-300-15PA

A.   FIXED PERIOD: We will pay the sum in equal installments for a specified number of years (not more than 30). The installments will be at least those shown in the Table of Guaranteed Payments on Page 19.

B.   FIXED AMOUNT: We will pay the sum in installments as mutually agreed upon until the original sum, together with interest on the unpaid balance, is used up.

3.  **Monthly Life Income:** We will pay the sum as a monthly income for life. The amount of the monthly payment will be at least that shown in the Table of Guaranteed Payments on Page 19. You may choose any one of three ways to receive monthly life income. We will guarantee payments for at least 10 years (called "10 Years Certain"); at least 20 years (called "20 Years Certain"); or until the payments we make equal the original sum (called "Refund Certain").

4.  **Other:** We will apply the sum under any other option requested that we make available at the time of the insured person's death or Net Cash Surrender Value withdrawal, or on the Final Policy Date, whichever applies.

We guarantee interest under the Deposit Option at the rate of 3% a year and under either Installment Option at 3½% a year. We may raise these guaranteed rates. We may also allow interest under the Deposit Option and under either Installment Option at a rate above the guaranteed rate.

The payee may name and change a successor payee for any amount we would otherwise pay to the payee's estate.

Any arrangements involving more than one of the options, or a payee who is not a natural person (for example, a corporation) or who is a fiduciary, must have our approval. Also, details of all arrangements will be subject to our rules at the time the arrangement takes effect. These include rules on: the minimum amount we will apply under an option and minimum amounts for installment payments; withdrawal or commutation rights; naming payees and successor payees; and proving age and survival.

Payment choices (or any later changes) will be made and will take effect in the same way as a change of beneficiary. Amounts applied under these options will not be subject to the claims of creditors or to legal process, to the extent permitted by law.

---

# Other Important Information

**Your Contract with Us.** This policy is issued in consideration of payment of the initial premium payment shown in the Policy Information section.

This policy, and the attached copy of the initial application and all subsequent applications to change this policy, and all additional Policy Information sections added to this policy, make up the entire contract. The rights conferred by this policy are in addition to those provided by applicable Federal and State laws and regulations.

Only our Chairman of the Board, our President or one of our Vice Presidents can modify this contract or waive any of our rights or requirements under it. The person making these changes must put them in writing and sign them.

**Policy Changes — Applicable Tax Law.** For you and the beneficiary to receive the tax treatment accorded to life insurance under Federal law, this policy must qualify initially and continue to qualify as life insurance under the Internal Revenue Code or successor law. Therefore, to assure this qualification for you we have reserved earlier in this policy the right to decline to accept premium payments, to decline to change death benefit options, to decline to change the Face Amount of Insurance, or to decline to make partial withdrawals that would cause this policy to fail to qualify as life insurance under applicable tax law as interpreted by us. Further, we reserve the right to make changes in this policy or its riders (for example, in the percentages on Pages 6 and 7) or to require additional premium payments or to make distributions from this policy to the extent we deem it necessary to continue to qualify this policy as life insurance. Any such changes will apply uniformly to all policies that are affected. You will be given advance written notice of such changes at least thirty days in advance.

If we receive written notice from you before the effective date of such action that you object to it, we will then give you written notice of your options as to the policy. They are either (1) to have the policy made paid-up for the amount of insurance for the insured person's lifetime that the Net Cash Value will buy when applied as a net single premium at the insured person's attained insurance age on such effective date; in that case all additional benefit riders to this policy will then terminate and,

thereafter, notwithstanding anything to the contrary in this policy, no further premiums will be accepted, no interest will be credited, no loans or partial withdrawals will be permitted, and no charges will be deducted. Under this option, the Cash Surrender Value will be equal to the net single premium for such paid-up insurance at the insured person's then attained insurance age; or (2) to continue making premium payments as before with continuation of existing policy and rider provisions (there may be adverse tax consequences for you and the beneficiary if you choose this option - check with your tax adviser before choosing it). If we do not receive your written election of one of these options within 30 days of the date of our notice to you regarding them, we will deem that you have chosen to have the policy made paid-up.

You may give us written notice that no further premium payments will be made under this policy and that it is to be made paid-up. As of the later of the date we receive such notice or the date, if any, you specify in the notice, we will make the policy paid-up as described above.

**Changes in Policy Cost Factors.** Changes in policy cost factors (interest rates we credit, cost of insurance deductions, and expense charges) will be by class and based upon changes in future expectations for such elements as: investment earnings, mortality, persistency, expenses and taxes. Any change in policy cost factors will be determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which this policy is delivered.

**When the Policy is Incontestable.** We have the right to contest the validity of this policy based on material misstatements made in the initial application for this policy. We also have the right to contest the validity of any policy change or restoration based on material misstatements made in any application for that change. However, we will not contest the validity of this policy after it has been in effect during the lifetime of the insured person for two years from the date of issue shown in the Policy Information section. We will not contest any policy change that requires evidence of insurability, or any restoration of this policy, after the change or restoration has been in effect for two years during the insured person's lifetime.

No statement shall be used to contest a claim unless contained in an application.

All statements made in an application are representations and not warranties.

See any additional benefit riders for modifications of this provision that apply to them.

**What if Age or Sex has Been Misstated?** If the insured person's age or sex has been misstated on any application and the insured is deceased, the death benefit and any benefits provided by riders to this policy shall be those which would be purchased by the most recent deduction for the cost of insurance, and the cost of any death benefits provided by riders, at the correct age and sex.

If the insured person's age or sex has been misstated on the application and the insured is living, the policy account is recalculated from issue using the cost of insurance charges based upon the correct age and sex.

**How the Suicide Exclusion Affects Benefits.** If the insured person commits suicide (while sane or insane) within two years after the Date of Issue shown in the Policy Information section, our liability will be limited to the payment of a single sum. This sum will be equal to the premiums paid, minus any loan and accrued loan interest and minus any partial withdrawal of the Net Cash Surrender Value. If the insured person commits suicide (while sane or insane) within two years after the effective date of a change that you asked for that increases the death benefit, then our liability as to the increase in amount will be limited to the payment of a single sum equal to the monthly cost of insurance deductions made for such increase plus the expense charge deducted for the increase (see Page 7).

**How We Measure Policy Periods and Anniversaries.** We measure policy years, policy months, and policy anniversaries from the Register Date shown in the Policy Information section. Each policy month begins on the same day in each calendar month as the day of the month in the Register Date.

**How, When and What We May Defer.** We may not be able to obtain the value of the assets of the investment divisions of our SA if: (1) the New York Stock Exchange is closed (except for normal holiday closing); or (2) the Securities and Exchange Commission requires trading to be restricted or declares an emergency. During such times, as to amounts allocated to the investment divisions of our SA, we may defer:

1.  Determination and payment of Net Cash Surrender Value withdrawals (except a loan to pay a planned periodic premium);

2.  Determination and payment of any death benefit in excess of the Face Amount of Insurance;

3.  Payment of loans (except a loan to pay a planned periodic premium);

4.  Determination of the unit values of the investment divisions of our SA; and

5.  Any requested transfer or the transfer on the Allocation Date.

As to amounts allocated to our GID, we may defer payment of any Net Cash Surrender Value withdrawal or loan amount (except a loan to pay a planned periodic premium to us) for up to six months after we receive a request for it. We will allow interest, at a rate of at least 3% a year, on any Net Cash Surrender Value payment derived from our GID that we defer for 30 days or more.

**The Basis We Use for Computation.** We provide Cash Surrender Values that are at least equal to those required by law. If required to do so, we have filed with the insurance supervisory official of the jurisdiction in which this policy is delivered a detailed statement of our method of computing such values. We compute reserves under this policy by the Commissioners Reserve Valuation Method.

We base minimum cash surrender values and reserves on the Commissioners 1980 Standard Ordinary Male and Female, Smoker and Non-Smoker, Mortality Tables. We also use these tables as the basis for determining maximum insurance costs and net single premiums, taking account of sex, attained age, rating class and Smoker or Non-Smoker status of the insured person. We use an effective annual interest rate of 4%.

**Policy Illustrations.** Upon request we will give you an illustration of the future benefits under this policy based upon both guaranteed and current cost factor assumptions. However, if you ask us to do this more than once in any policy year, we reserve the right to charge you a fee for this service.

**Policy Changes.** You may add additional benefit riders or make other changes, subject to our rules at the time of change.

## Table of Guaranteed Payments
### (MINIMUM AMOUNT FOR EACH $1,000 APPLIED)

### Option 2A
#### FIXED PERIOD INSTALLMENTS

| Number of Years Installments | Monthly Installment | Annual Installment |
|---|---|---|
| 1 | $84.70 | $1,000.00 |
| 2 | 43.08 | 508.60 |
| 3 | 29.21 | 344.86 |
| 4 | 22.28 | 263.04 |
| 5 | 18.12 | 213.99 |
| 6 | 15.36 | 181.32 |
| 7 | 13.38 | 158.01 |
| 8 | 11.91 | 140.56 |
| 9 | 10.76 | 127.00 |
| 10 | 9.84 | 116.18 |
| 11 | 9.09 | 107.34 |
| 12 | 8.47 | 99.98 |
| 13 | 7.94 | 93.78 |
| 14 | 7.49 | 88.47 |
| 15 | 7.11 | 83.89 |
| 16 | 6.77 | 79.89 |
| 17 | 6.47 | 76.37 |
| 18 | 6.20 | 73.25 |
| 19 | 5.97 | 70.47 |
| 20 | 5.76 | 67.98 |
| 21 | 5.57 | 65.74 |
| 22 | 5.40 | 63.70 |
| 23 | 5.24 | 61.85 |
| 24 | 5.10 | 60.17 |
| 25 | 4.97 | 58.62 |
| 26 | 4.84 | 57.20 |
| 27 | 4.73 | 55.90 |
| 28 | 4.63 | 54.69 |
| 29 | 4.54 | 53.57 |
| 30 | 4.45 | 52.53 |

If installments are paid each 3 months, they will be 25.32% of the annual installments. If they are paid each 6 months, they will be 50.43% of the annual installments.

### Option 3
#### MONTHLY LIFE INCOME

| AGE | 10 Years Certain | | 20 Years Certain | | Refund Certain | |
|---|---|---|---|---|---|---|
| | Male | Female | Male | Female | Male | Female |
| 50 | $4.50 | $3.96 | $4.27 | $3.89 | $4.28 | $3.87 |
| 51 | 4.58 | 4.02 | 4.32 | 3.94 | 4.35 | 3.93 |
| 52 | 4.67 | 4.09 | 4.38 | 4.00 | 4.42 | 3.99 |
| 53 | 4.75 | 4.16 | 4.44 | 4.06 | 4.50 | 4.05 |
| 54 | 4.85 | 4.24 | 4.50 | 4.12 | 4.58 | 4.11 |
| 55 | 4.94 | 4.32 | 4.56 | 4.18 | 4.66 | 4.18 |
| 56 | 5.04 | 4.40 | 4.62 | 4.24 | 4.74 | 4.25 |
| 57 | 5.15 | 4.49 | 4.68 | 4.31 | 4.83 | 4.33 |
| 58 | 5.26 | 4.58 | 4.74 | 4.38 | 4.93 | 4.41 |
| 59 | 5.37 | 4.68 | 4.81 | 4.45 | 5.03 | 4.49 |
| 60 | 5.49 | 4.78 | 4.86 | 4.52 | 5.13 | 4.58 |
| 61 | 5.62 | 4.89 | 4.92 | 4.59 | 5.24 | 4.67 |
| 62 | 5.75 | 5.00 | 4.98 | 4.66 | 5.35 | 4.77 |
| 63 | 5.88 | 5.12 | 5.04 | 4.73 | 5.48 | 4.88 |
| 64 | 6.03 | 5.25 | 5.09 | 4.80 | 5.60 | 4.99 |
| 65 | 6.17 | 5.39 | 5.14 | 4.88 | 5.74 | 5.10 |
| 66 | 6.32 | 5.53 | 5.19 | 4.95 | 5.88 | 5.22 |
| 67 | 6.48 | 5.68 | 5.24 | 5.01 | 6.03 | 5.35 |
| 68 | 6.64 | 5.83 | 5.28 | 5.08 | 6.18 | 5.49 |
| 69 | 6.80 | 6.00 | 5.32 | 5.14 | 6.35 | 5.64 |
| 70 | 6.97 | 6.17 | 5.35 | 5.20 | 6.53 | 5.79 |
| 71 | 7.15 | 6.34 | 5.38 | 5.26 | 6.71 | 5.96 |
| 72 | 7.32 | 6.53 | 5.41 | 5.30 | 6.91 | 6.13 |
| 73 | 7.50 | 6.72 | 5.43 | 5.35 | 7.12 | 6.32 |
| 74 | 7.67 | 6.92 | 5.45 | 5.38 | 7.34 | 6.52 |
| 75 | 7.85 | 7.12 | 5.47 | 5.42 | 7.58 | 6.73 |
| 76 | 8.02 | 7.32 | 5.48 | 5.44 | 7.82 | 6.96 |
| 77 | 8.19 | 7.53 | 5.49 | 5.46 | 8.09 | 7.21 |
| 78 | 8.36 | 7.75 | 5.50 | 5.48 | 8.38 | 7.47 |
| 79 | 8.52 | 7.96 | 5.50 | 5.49 | 8.67 | 7.75 |
| 80 | 8.67 | 8.16 | 5.51 | 5.50 | 9.00 | 8.05 |
| 81 | 8.81 | 8.36 | 5.51 | 5.51 | 9.34 | 8.39 |
| 82 | 8.94 | 8.55 | 5.51 | 5.51 | 9.70 | 8.73 |
| 83 | 9.06 | 8.73 | 5.51 | 5.51 | 10.10 | 9.12 |
| 84 | 9.16 | 8.90 | 5.51 | 5.51 | 10.52 | 9.53 |
| 85 & over | 9.26 | 9.05 | 5.51 | 5.51 | 10.96 | 9.97 |

Amounts for Monthly Life Income are based on age nearest birthday when income starts. Amounts for ages not shown will be furnished on request.

# Substitution of Insured Rider

*In this rider, "we", "our" and "us" mean Equitable Variable Life Insurance Company. "You" means the Owner of the policy at the time an Owner's right is exercised.*

After the first policy year you may substitute coverage on the life of a new insured person for coverage on the life of the original insured person, subject to conditions we determine. These conditions include but are not limited to the following:

1. We must be satisfied that the new insured person is insurable for the amount of insurance applied for.

2. The new insured person must join in the request for substitution. The owner and beneficiary of the policy must have an insurable interest in the new insured person. If the policy is assigned, the assignee must consent to the substitution of coverage.

3. The substitution may be made as of the beginning of any policy month if the new insured person is not then over age 65.

4. The new insured person's date of birth must not be later than the Register Date of the policy.

5. This policy must be in effect on the date of substitution with all monthly deductions from the Policy Account having been made, and with no such deductions then being waived nor amounts credited to the Policy Account by a disability rider.

6. Within 31 days before the date of substitution, we must receive: (a) written request for the substitution on our application form; (b) evidence of the new insured person's insurability satisfactory to us; and (c) any extra sum we may require.

7. We will require repayment of any loan and accrued loan interest on this policy that is in excess of the loan value at the time the substitution takes effect. We will carry over any loan and accrued loan interest not repaid.

8. Insurance on the original insured person will cease when insurance on the new insured person takes effect.

9. Any additional benefit riders in effect under the policy will terminate at the time of substitution of insureds. You may apply for any of them as to the

new insured person. The issue of such riders will require our consent and evidence of insurability satisfactory to us.

10. In our determination the substitution must not affect the qualification of this policy as life insurance under the Internal Revenue Code or successor legislation, as interpreted by us.

**EFFECTS OF SUBSTITUTION.** Planned periodic premiums for the policy will be based on our rules in effect on its Register Date for the insurance age of the new insured person on that date. The Register Date for the policy will not be affected by the substitution of insureds. The face amount of insurance and the death benefit option in the policy will be the same as in effect immediately before the substitution, unless either (i) you ask for a change or (ii) a change is required in order to continue the qualification of the policy as life insurance under the Internal Revenue Code or successor legislation.

The substitution of a new insured person for the original insured person shall not preclude additional later substitutions of insureds, in which case reference to the "original insured person" shall include such substituted insureds as the context requires.

The time periods in the Incontestability and Suicide Exclusion provisions of the policy will begin on the date of substitution.

**HOW THIS RIDER RELATES TO THE POLICY.** This rider is a part of the policy. Its benefits are subject to all the terms of this rider and the policy.

*Equitable Variable Life Insurance Company*

*Molly K. Heines*

Molly K. Heines, Vice President & Secretary

*Joseph J. Melone*

Joseph J. Melone, Chairman & Chief Executive Officer

R90-212PA        Substitution of Insured

☐ The Equitable Life Assurance Society of the United States

☐ The Equitable of Colorado, Inc.

**REDACTED**

**Application Part 1 To**

REQUEST FOR: ☐ CHANGE (as specified in Section I) ☐ REINSTATEMENT, OR ☐ DELIVERY    OF POLICY NO.

IS THE POLICY TAX-QUALIFIED? ☐ YES ☐ NO

## SECTION I

**Requested Change** (see below for adding RTI and CTI): _DECREASE FACE AMOUNT TO $1 MILLION. I UNDERSTAND THIS CHANGE WILL RESULT IN PRO RATA SURRENDER CHARGES._

_ALL ELSE REMAINS THE SAME._

**Add** Renewable Term Rider (RTI) on Insured Amt. S_____; on Additional Insured Amt. S_____

Children's Term Rider (CTI) Amt. S_____ Units _____

For RTI on Additional Insured and for CTI, the Beneficiary will be as stated in the rider for those benefits unless otherwise designated above in "Requested Change" (in any designation include **Full Name and Relationship** to Insured.)

*Complete below and answer the Questions in Section II as to the Additional Insured and as to each Child proposed for CTI*

**PERSON(S) TO BE COVERED UNDER RTI ON ADDITIONAL INSURED AND/OR CTI:**

NOTE. To be eligible for CTI, Children (including stepchildren and legally adopted children) must not have reached their 18th birthday. Coverage does not begin until a child is 15 days old.

| | | | | | Date of Birth | | |
|---|---|---|---|---|---|---|---|
| RTI or CTI* | First Name | Middle Initial | Last Name | Sex | Mo. | Day | Yr. |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

*Complete a – f, only as to Additional Insured for RTI.*

a. List all current occupations – Give Title(s) and Duties _____

d. Residence. State of _____

e. Owner's Relationship to Addl. Insured: _____

b. Age Nearest Birthday _____

c. Place of Birth: State of _____

f. U.S. Citizen? ☐ Yes ☐ No (If "No," Country) _____

## SECTION II

*For all persons, whether now covered or to be covered, answer Questions 1 and 2. Also answer Questions 3 through 7 if Non-Medical.*

**Has any person to be covered:**

1  a. Ever had a driver's license suspended or revoked or, within the last three years, been convicted of two or more moving violations or driving under the influence of alcohol or drugs? *(Give full details – including dates, types of violations, and reason for license suspension or revocation.)*  ☐ Yes ☐ No

b. Any plan to travel or reside outside the U.S.? *(Give full details.)*  ☐ Yes ☐ No

c. Any other life insurance now in effect or application now pending? *(State companies and amounts.)*  ☐ Yes ☐ No

d. Been disabled for 2 weeks or more within the last 2 years? *(Give full details.)*  ☐ Yes ☐ No

2  a. Within the last year flown other than as a passenger or plan to do so? *(Give full details.)*  ☐ Yes ☐ No

If "Yes": Total flying time at present _____ Hours.

Last 12 mos. _____ Hours;

Next 12 mos. _____ Est. Hours.

*(Complete Aviation Supplement for crop-dusting: pilot instruction; or commercial, competitive helicopter, military stunt or test flying.)*

b. Engaged within the last year, or any plans to engage in motor racing on land or water, underwater diving, sky diving, ballooning, hang-gliding, parachuting, or flying ultra-light aircraft?

(If "Yes," complete Avocation Supplement.)  ☐ Yes ☐ No

c. Ever had an application for life or health insurance declined, that required an extra premium or was otherwise modified? *(Give full details.)*  ☐ Yes ☐ No

d. Replaced or changed any other existing insurance or annuity (or any plan to do so) assuming that any new insurance applied for will be issued? *(Give full details. State companies, plans and amounts.)*  ☐ Yes ☐ No

3. Primary Insured:    Height _____ Ft. _____ In. Weight _____ lbs.

Additional Insured.    Height _____ Ft. _____ In. Weight _____ lbs.

4. a. Ever been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer, respiratory or neurological disorder? *(Give full details.)*  ☐ Yes ☐ No

b. Within the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility? *(Give full details. Include medical check-ups in the last 2 years. Do not include colds, minor injuries, or normal pregnancy.)*  ☐ Yes ☐ No

180-333D-NJ (2/01)    CAT NO. 129440    E2102_23    Page 1

Has any person to be covered:

5.  a - In the last 12 months:
    (i) Smoked cigarettes? *(Give full details.)* ☐ Yes ☐ No
    (ii) Used any other form of tobacco? *(Give full details )* ☐ Yes ☐ No
    b - In the last 5 years:
    (i) Smoked cigarettes? *(Give full details.)* ☐ Yes ☐ No
    (ii) Used any other form of tobacco? *(Give full details )* ☐ Yes ☐ No

6.  In the last 10 years:
    a. Used, except as legally prescribed by a physician, tranquilizers, barbiturates or other sedatives, marijuana, cocaine, hallucinogens or other mood-altering drugs; heroin, methadone or other narcotic amphetamines or other stimulants; or any other illegal or controlled substances? *(Give full details)* ☐ Yes ☐ No
    b. Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings or membership in any self-help group or program such as Alcoholics Anonymous or Narcotics Anonymous? *(Give full details )* ☐ Yes ☐ No

7.  In the last 10 years, been
    a. Diagnosed by a member of the medical profession as having Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC)? *(Give full details )* ☐ Yes ☐ No
    b. Treated by a member of the medical profession for AIDS or ARC? *(Give full details )* ☐ Yes ☐ No

8.  DETAILS. For each yes answer give Question number, name of person(s) affected and full details below. For 4 through 7 also include conditions, dates, durations, treatment and results and names and addresses of physicians and medical facilities.

| No. | Name of Person Affected | Details |
|-----|-------------------------|---------|
|     |                         |         |
|     |                         |         |
|     |                         |         |
|     |                         |         |

## SIGNATURE REQUIREMENTS

*Change* Owner (and Assignee if policy is assigned) must sign. Each person covered by the change, on whom evidence of insurability is required, must also sign.

*Reinstatement* Each person covered by the policy must sign. If the Insured is not the Owner or if the policy is absolutely assigned, the Owner or Absolute Assignee must also sign.

*Delivery* Same signature requirements as on original application.

NOTE: If the Owner or any person to be covered is a child under age 15, the parent or guardian must sign for the child.

**AGREEMENT.** Each signer of this application agrees that:

(1) The statements and answers in all parts of this application are true and complete to the best of my knowledge and belief. The Insurer may rely on them in acting on this application.

(2) The Insurer shall incur no liability under this request

   (a) until it has been approved by the Insurer and the full consideration required in connection with it has been paid, and

   (b) if evidence of insurability is required, unless the statements and answers made part of this request and offered as evidence of insurability are, without material change, true and complete to the best of my knowledge and belief as of the time of payment of such consideration.

(3) No Agent or medical examiner has authority to modify this Agreement or waive any of the Insurer's rights or requirements. The Insurer shall not be bound by any information unless it is stated in application Part 1 or Part 2, or in any other form submitted with this request.

(4) Any new policy issued in connection with a change request shall be subject to: (1) Any assignment of the original policy or contract in force and on file with the Insurer, and (2) Any loan made by the Insurer on the original policy or contract and the rights of the Insurer in connection with it.

**Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.**

X _____

Signature(s) *See above for Signature Requirements.*
Dated at CHERRY HILL N.J. on 5/24/04
   *City*    *State*

1. Will any other existing insurance or annuity be replaced or changed for has it been assuming the insurance applied for will be issued? ☐ Yes ☒ No

2. I certify that I have asked and recorded completely and accurately the answers to all questions on the application Part 1, and I know of nothing affecting the risk that has not been recorded herein.

3. ☐ I have witnessed the signatures required on Part 1.
   ☒ I have not witnessed the signatures required on Part 1.
   *(Give full details )*

Agent's Signature _____ Date 6/8/04
*Also complete Production Credits information below.*

---

**TO BE COMPLETED BY AGENT**
**For Production Credits (Service Financial Professional first)**

| (Print) Agent's Name(s) | Initial of Last Name | Number | % Int |
|-------------------------|----------------------|--------|-------|
|                         |                      |        |       |
|                         |                      |        |       |

Agency & Code No. _____

District & Code No _____

Date 6/8/04

Agent's Signature _____

**Part 1: Application For Life Insurance To:**

EQUITABLE VARIABLE LIFE INSURANCE COMPANY (Equitable Variable) Home Office: 787 Seventh Avenue, New York, NY 10019

**1. PROPOSED INSURED** (Print Name as it is to appear on the policy)    *Please print in ink.*

a. Title: ☐ Mr. ☒ Mrs. ☐ Ms. ☐ Miss ☐ Other Title

b. Name: ABLENE (First)   CHARLOTTE (Middle)   SHUSTER (Last)

c. Date of Birth Mo. REDACTED   d. Age Nearest Birthday 48   e. Sex ☐ M ☒ F   f. Place of Birth: Philadelphia

g. Soc. Sec. No. REDACTED   h. Previous/Other Name (If Applicable) NONE ERG   i. U.S. Citizen? ☒ Yes ☐ No If No, Country _____

j. Current Occupation(s): (1) Title Psychiatric Social Worker   (2) Duties: Inpatient Therapy + Placement   (3) How Long? 24.3m
If less than 1 year at current occupation, give previous in Special Instructions.

k. Residence/Care of: REDACTED   #____   Years there? 8

Current CHERRY HILL (City)   NJ (State)   08003- (Zip+4 Code)

Previous (If less than 2 years at current) REDACTED

l. Tel.: (1) Home REDACTED   (2) Business REDACTED   m. Currently employed? ☒ Yes ☐ No ☐ Retired

n. Employer Name: REDACTED   o. Years Employed: REDACTED

p. Employer Address: REDACTED

**2. APPLICANT** (If not Proposed Insured)

a. Name: (First) (Middle) (Last)

b. Relationship to Proposed Insured _____   c. Date of Birth Mo. Day Yr.   d. Sex ☐ M ☐ F

e. Place of Birth: _____   f. Current Occupation(s): (1) Title _____   (2) Duties: _____
If less than 1 year at current occupation, give previous in Special Instructions.

g. Address: Same as— ☐ Question 1.k. Residence or ☐ Question 1.p. Business
Other Residence: (No. & Street) (City) (State) (Zip+4 Code) (Apt/Suite/Bldg.)

Business: (No. & Street) (City) (State) (Zip+4 Code)

**3. POLICYOWNER**

a. The Owner is: (1) ☒ Proposed Insured   (2) ☐ Applicant
(3) ☐ Other: (1) ☐ Individual (b) ☐ Corporation (c) ☐ Partnership (d) ☐ Trust Dated Mo. Day Yr.   (e) ☐ Qualified Plan
(f) Name of Person First (Middle) (Last)
Name of firm or plan
(g) If an individual, indicate: ☐ Mr. ☐ Mrs. ☐ Ms. ☐ Miss ☐ Other Title   (h) Relationship to Insured _____

b. Owner's Mailing Address: Same as— ☒ Current Residence (1.k.) or ☐ Applicant's Residence (2.g.)
Other: Care of: C / O
(No. & Street) (Apt/Suite/Bldg.)
(City) (State) (Zip+4 Code)

c. Answer if Policyowner is not Proposed Insured: (1) Soc. Sec. or Tax I.D. Number
(2) Date of Birth: ☐ Same as 2.c. or Mo. Day Yr.   (3) Tel.:

d. Successor Owner (if desired) Give full name: _____   and Relationship to Insured: _____
If the Owner or Successor Owner is other than the Proposed Insured, and if all persons so designated die before the Proposed Insured, the Owner will be the estate of the last such person to die, except where the Proposed Insured is a child. In cases where the Proposed Insured is a child and the Applicant is to be the Owner or Successor Owner and the Applicant dies before the Insured child, the child will be the Owner unless otherwise designated. In such designation, include Owner's full name and relationship to the child, and the Owner's social security or tax number.

**4. BENEFICIARY for Insurance on Proposed Insured.** Include Full Name and Relationship to Proposed Insured.

| a. Primary Beneficiary(ies): Name(s) | Relationship | Name(s) | Relationship |
|---|---|---|---|
| (1) BERNARD SHUSTER | Spouse | (2) | |

b. Contingent Beneficiary(ies)
(1) _____   (2) _____

Note: Unless otherwise requested, the contingent beneficiary will be the surviving children of the Insured in equal shares. If none survive, payment will be made to the Insured's estate. The Beneficiary(ies) under any Term Insurance Rider or any Additional Insured or on a Child will be as stated in those riders, unless otherwise designated in Special Instructions. In any such designation, give full name and relationship of beneficiary(ies) to the Insured.

EV4-200Y-J    1

NO. A 08687

## 5. PLAN DESCRIPTION AND PREMIUM PAYMENT METHOD

**a.** Plan _IL 2000_

**b.** Initial Face Amount $ _1,964,000_

**c.** If Modified Premium VLI (Complete only if more than Scheduled Premium. If Billed Premium specified is less than Scheduled Premium, we automatically bill the Scheduled Premium.)
Billed Premium $ _____

**d.** If Flexible Premium VLI: (a.) Initial Premium Payment $ _100,000_
(b.) Planned Periodic Payments $ _100,000_

**e.** Death Benefit Option: ☒ Option A ☐ Option B (B-Plus for Flex. Prem.-IL 2000)

**f.** Premium Mode: ☒ Annual ☐ Semi-Annual ☐ Quarterly ☐ System-Matic (Complete S-M item)

**g.** ☐ Salary Allotment (1) Unit Name _____ (2) Register Date __/__/__

(3) Unit/Sub Unit No. [_____] (4) Payroll No. _____

(5) Allotter's Name _____ (6) Allotter's No. _____
(if other than Proposed Insured)

**h.** ☐ Military Allotment: Branch _____ Register Date: _____

**I.** Initial Allocations To Investment Options*

| | For Premiums % | For Deductions % |
|---|---|---|
| (1) Guaranteed Interest (Whole percentages only) | (1) | (1) |
| (2) Money Market | (2) _100_ % | (2) _100_ % |
| (3) Intermediate Gov't. Securities | (3) % | (3) % |
| (4) Short-Term World Income | (4) % | (4) % |
| (5) High Yield | (5) % | (5) % |
| (6) Balanced | (6) % | (6) % |
| (7) Common Stock | (7) % | (7) % |
| (8) Global | (8) % | (8) % |
| (9) Aggressive Stock | (9) % | (9) % |
| (10) Asset Allocation Series: | | |
| a. Conservative Investors | (10a.) % | (10a.) % |
| b. Growth Investors | (10b.) % | (10b.) % |
| (11) | (11) % | (11) % |
| (12) | (12) % | (12) % |
| | 100% | 100% |

* Except for initial allocations to Guaranteed Interest, your Policy Account will be allocated according to these percentages on the first business day 20 days after the date of issue of your policy. Before that time, all Policy Account allocations (except to Guaranteed Interest) will be to the Money Market Division.    Consult prospectus for investment option information.

## 6. OPTIONAL BENEFITS

**a.** ☐ Accidental Death Benefit* (Specify amount) $ _____

**b.** ☐ Disability Premium Waiver* (Modified Premium VLI only)

**c.** ☐ Disability - Waiver Monthly Deductions* (Flex Prem-IL 2000 only)
*Juvenile Limitations: If applied for, the Accidental Death Benefit is payable only if the Child dies as a result of an accident after the Child's first birthday; the Disability Waiver Benefits are effective only if the Child becomes totally disabled on or after the Child's 5th birthday.

**d.** ☐ Designated Insured Option (Flex Prem/IL 2000 only)**

**e.** ☐ Other _____

**SURVIVORSHIP VLI RIDERS**

**f.** ☐ Estate Protector

**TERM RIDERS**

**g.** ☐ Renewable Term:
(1) On Insured $ _____ (2) On Add'l Insured** $ _____
(Available on Modified Premium VLI only)

**h.** ☐ Children's Term** $ _____ Units _____

** If coverage is elected be sure to complete applicable parts of Question 8, and answer Questions 10 through 16 with respect to the Additional, Designated Insured(s) and/or Children for Term Insurance Rider.

## 7. COMPLETE FOR PROPOSED ADDITIONAL OR DESIGNATED INSURED(S), CHILDREN'S TERM RIDER OR JUVENILE INSURANCE

Also answer Questions 10 through 16 with respect to Proposed Additional or Designated Insured(s) and/or Children under Children's Term Rider.

**a.** Title: ☐ Mr. ☐ Mrs. ☐ Ms. ☐ Miss ☐ Other Title [____]

**b.** Proposed Add'l Insured: First [_____] Middle [_____] Last [_____]

Date of Birth Mo. [__] Day [__] Yr. [__] Age Nearest Birthday [__] Sex ☐ M ☐ F Place of Birth: _____ Soc. Sec. No. [_____]

Previous/Other Name (if Applicable) _____ Relationship of Owner to Add'l Insured: _____ State of Residence: _____

Current Occupation(s): (1) Title: _____ (2) Duties: _____ (3) How Long? _____
If less than 1 year at current occupation, give previous in Special Instructions.

**c.** Proposed Designated Insured (to add others, submit form 160-333D or successor): First [_____] Middle [_____] Last [_____]

Date of Birth Mo. [__] Day [__] Yr. [__] Age Nearest Birthday [__] Sex ☐ M ☐ F Place of Birth: _____ Soc. Sec. No. [_____]

Previous/Other Name (if Applicable) _____ Relationship of Owner to Designated Insured: _____ State of Residence: _____

Current Occupation(s): (1) Title: _____ (2) Duties: _____ (3) How Long? _____
If less than 1 year at current occupation, give previous in Special Instructions.

**d.** Children for Term Insurance Rider (Use Special Instructions if more space is needed.)*
First [_____] Middle [_____] Last [_____]

Date of Birth Mo. [__] Day [__] Yr. [__] Sex ☐ M ☐ F Relationship to Owner _____

First [_____] Middle [_____] Last [_____]

Date of Birth Mo. [__] Day [__] Yr. [__] Sex ☐ M ☐ F Relationship to Owner _____

First [_____] Middle [_____] Last [_____]

Date of Birth Mo. [__] Day [__] Yr. [__] Sex ☐ M ☐ F Relationship to Owner _____

*Note: To be eligible, children (including stepchildren and legally adopted children) must not have reached their 18th birthday. Coverage does not begin until a child is 15 days old.

**e.** For Juvenile Insurance (Ages 0-14): (1) Will there be more life insurance in effect on this Child than on any other child in the family? ☐ Yes ☐ No
If "Yes", explain _____ (2) Total Life Insurance in effect on Applicant: $ _____

## 8. OPAI. COMPLETE IF EXERCISING OPTION TO PURCHASE ADDITIONAL INSURANCE

**a.** (1) ☐ Regular;  (2) ☐ Birth or Adoption; Child's Name _____ ; Date of Birth or Adoption __/__/__ ;  (3) ☐ Alternate

**b.** Existing original policy no. _____ **c.** Option Date __/__/__ **d.** Option Amount $ _____

**e.** If applying for Disability Premium Waiver, is Proposed Insured now totally disabled as defined in the Disability Premium Waiver Provision of the original policy indicated above in b.? _____ ☐ Yes ☐ No

This application is made under a provision in the existing policy indicated in 8.b. above, permitting the purchase of additional individual life insurance (the "Option Provision"). If this application is made within the time allowed and in accordance with the other terms in the Option Provision, including timely payment of the full first premium for the additional insurance, then the additional insurance shall take effect upon the terms of the policy the Insurer would issue. Otherwise, the additional insurance shall not take effect.    (Answer Questions 10 through 16 only if evidence of insurability is required in connection with an optional benefit or any excess of the insurance amount applied for over the insurance amount permitted by the Option Provision.)

EV4-200Y-J                                                                                2

## 9. SUITABILITY (All VLI Plans)

**a. Have you, the Proposed Insured or the Owner, if other than the Proposed Insured, received:**

(1) a prospectus for the policy(ies) applied for? ............................................................ ☒Yes ☐No
Date of prospectus _11 27 91_ Date of any supplement(s) _5 1 92_; _7 17 92_; _/ / ;_

(2) a prospectus for the Hudson River Trust? ................................................................ ☒Yes ☐No
Date of prospectus _5 1 92_ Date of any supplement(s) _/ / ; _/ / _; _/ / _

(3) a prospectus for the designated investment company(ies) _____ ? ........ ☐Yes ☒No
Date of prospectus _/ / _ Date of any supplement(s) _/ / _; _/ / _; _/ / _

**b.** Do you understand that (i) policy values reflect certain deductions and charges and may increase or decrease depending on credited interest for Guaranteed Interest Division and/or the investment experience of Separate Account Divisions and (ii) the cash value may be subject to a surrender charge, if any, upon policy surrender, lapse or face amount reduction? ................ ☒Yes ☐No

**c.** With this in mind, is (are) the policy(ies) in accord with your insurance and long-term investment objectives and anticipated financial needs? .................................................................................................... ☒Yes ☐No

**OTHER INFORMATION**   For any "Yes" response, provide full details.

**Has any person proposed for insurance:**

**10. a.** Ever had a driver's license suspended or revoked, or within the last 3 years been convicted of 2 or more moving violations or driving under the influence of alcohol or drugs?  ...........................................  [REDACTED]
(If "Yes", include dates, types of violation, and reason for suspension or revocation.)

**b.** Any plans to travel or reside outside the United States? .................................................

**c.** Any other life insurance now in effect or application now pending? ...................................
(Give companies and amounts and policy numbers if Equitable.)

**d.** Been disabled for 2 or more weeks within the last 2 years? ............................................

**11. a.** In the last year flown other than as a passenger or plan to do so? ..................................
If "Yes", enter total flying time at present _____ hours; last 12 mos. _____ hours; next 12 mos. _____ est. hours.
(Complete Aviation Supplement for crop dusting; pilot instruction; or commercial, competitive, helicopter, military, stunt or test flying.)

**b.** Engaged within the last year or any plan to engage in motor racing on land or water, underwater diving, skydiving, ballooning, hang gliding, parachuting or flying ultra-light aircraft? (If "Yes", complete Avocation Supplement.)  ...  [REDACTED]

**c.** Ever had an application for life or health insurance that was declined, required an extra premium or other modification? ......
(If "Yes", state companies and provide full details.)

**d.** Replaced or changed any existing insurance or annuity (or any plan to do so) assuming the insurance applied for will be issued?
(If "Yes", state companies, plans and amounts.)

**ANSWER Questions 12-16 only if Non-Medical**

**12. a.** Proposed Insured: Hgt. ___Ft.___In.; Wgt. ___lbs.  **b.** Additional Insured: Hgt. ___Ft.___In.; Wgt. ___lbs.  **c.** Designated Insured: Hgt. ___Ft.___In.; Wgt. ___lbs.

**Has any person proposed for insurance:**

**13. a.** Ever had or been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer, respiratory or neurological disorder? ....................................................................... ☐Yes ☐No

**b.** In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility? .......... ☐Yes ☐No
(Include medical check-ups in the last 2 years. Do not include colds, minor injuries or normal pregnancy.)

**14.** In the last 12 months: **a.** Smoked cigarettes? .................................................................. ☐Yes ☐No
**b.** Used any other form of tobacco? ......................................................... ☐Yes ☐No

**15.** In the last 10 years:

**a.** Used, except as legally prescribed by a physician, tranquilizers; barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood-altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances? .............................................. ☐Yes ☐No

**b.** Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings or membership in any self-help group or program such as Alcoholics Anonymous or Narcotics Anonymous? ............ ☐Yes ☐No

**16.** In the last 10 years, been:

**a.** Diagnosed by a member of the medical profession as having Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC)? ......................................................................... ☐Yes ☐No

**b.** Treated by a member of the medical profession for AIDS or ARC? ........................................... ☐Yes ☐No

**17. DETAILS/SPECIAL INSTRUCTIONS/ADDITIONAL INFORMATION** For each "Yes" answer give Question Number, name of person(s) affected, and full details. For 13-16 include conditions, dates, durations, treatment and results, and names and addresses of physicians and medical facilities.

| Ques. No. | Name of Person | Details (Attach additional sheets if more space needed) | |
|---|---|---|---|
| 10 C | ARLENE SHUSTER | $100,000 FEDERAL KEMPER | as |
| 10 A | ARLENE SHUSTER | $100,000 FEDERAL KEMPER | |
| | | | |
| | | | |

EV4-200Y-J

**18. COMPLETE IF MONEY IS PAID OR AN APPROVED PAYMENT AUTHORIZATION IS SIGNED BEFORE THE POLICY IS DELIVERED:** Have the undersigned read and do they agree to the conditions of Equitable Variable's Temporary Insurance Agreement, including: (i) the requirement that all of the conditions in that Agreement must be met before any temporary insurance takes effect, and (ii) the $500,000 insurance amount limitation?  ☐ Yes  ☐ No  *(If "No," or if any Person Proposed for Insurance has been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession within the last 10 years or had cancer, a stroke, or a heart attack within the last year, a premium may not be paid nor an approved payment authorization signed before the policy is delivered.)*
☐ **Amount Paid: $** _____ *(Draw checks to the order of Equitable Variable.)*  ☐ **Approved Payment Authorization signed.**

**19. SOCIAL SECURITY OR TAX I.D. NUMBER CERTIFICATION.** I, the proposed policyowner, by my signature below, certify under penalties of perjury that (i) the number shown in question 3.c.(1) or 1.g. of this form is my correct taxpayer identification number, and (ii) I  ☐ am  ☐ am not subject to a backup withholding order issued by the Internal Revenue Service. I understand that failure to furnish the correct information may subject me to Federal backup withholding.

**AGREEMENT.** Each signer of this application agrees that:

(1). The statements and answers in all parts of this application are true and complete to the best of my (our) knowledge and belief. Equitable Variable may rely on them in acting on this application.

(2). Equitable Variable's Temporary Insurance Agreement states the conditions that must be met before any insurance takes effect if money is paid or an approved payment authorization is signed, before the policy is delivered. Temporary Insurance is not provided for a policy or benefit applied for under the terms of a guaranteed insurability option or a conversion privilege.

(3). Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application: (a) until a policy is delivered and the full initial premium for it is paid, or an approved payment authorization is signed, while the person(s) proposed for insurance is (are) living; (b) before any Register Date specified in this application; and (c) unless to the best of my (our) knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material change, as of the time such premium is paid or an approved payment authorization is signed.

(4). No agent or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement, nor to waive any of Equitable Variable's rights or requirements. Equitable Variable shall not be bound by any information unless it is stated in Application Part 1 or Part 2.

(5). **Policy values increase or decrease depending on credited interest for the Guaranteed Interest Division and/or investment experience of the Separate Account Divisions and reflect certain deductions and charges. The death benefit may be fixed or variable under specified conditions, as described in the policy.**

> VLI Notice: Available on request are illustrations of benefits, including death benefits, policy values and cash surrender values.

## ACKNOWLEDGEMENT AND AUTHORIZATIONS

**UNDERWRITING PRACTICES.** I (We) have received a statement of the underwriting practices of Equitable Variable which describes how and why Equitable Variable obtains information on my insurability, to whom such information may be reported and how I may obtain it. The statement also contains the notice required by the Fair Credit Reporting Act.

**AUTHORIZATIONS:**
**To Obtain Medical Information.** I (we) authorize any physician, hospital, medical practitioner or other facility, insurance company, and the Medical Information Bureau to release to Equitable Variable and its legal representative any and all information they may have about any diagnosis, treatment and prognosis regarding my physical or mental condition.

**To Obtain Non-Medical Information.** I (we) authorize any employer, business associate, government unit, financial institution, Consumer Reporting Agency, and the Medical Information Bureau to release to Equitable Variable and its legal representative any information they have about my occupation, avocations, finances, driving record, character and general reputation. I also authorize Equitable Variable to obtain investigative consumer reports, as appropriate.

**To Use and Disclose Information.** I (we) understand that the information that I (we) authorize Equitable Variable to obtain will be used by Equitable Variable to help determine my insurability or my eligibility for benefits under an existing policy. I (we) authorize Equitable Variable to release information about my insurability to its reinsurers, contractors and affiliates, my (our) Equitable Variable Agent, and to the Medical Information Bureau, all as described in the statement of Equitable Variable's underwriting practices or to other persons or businesses performing business or legal services in connection with my application or claim of eligibility for benefits, or as may be otherwise lawfully required, or as I (we) may further authorize. I (we) understand that I (we) have the right to learn the contents of any report of information (generally, through my physician, in the case of medical information).

**COPY OF AUTHORIZATIONS.** I (we) have a right to ask for and receive a true copy of this Acknowledgement and Authorizations signed by me (us). I (we) agree that a reproduced copy will be as valid as the original.

**DURATION.** I (we) agree that these authorizations will be valid for 12 months from the date shown below.

*Laws in your state may make it a crime to fill out an insurance or annuity application with information you know is false or to leave out material facts.*

Dated at City _____ BALA CYNWYD_____

X _____
Signature of Proposed Insured or Applicant if Proposed Insured is a Child, Issue Age 0-14.

State _____ PA _____

X _____
Signature of Proposed Additional Insured, if any.

on _____ 1/25 _____ 19 93

X _____
Signature of Applicant if not Proposed Insured or Owner.

_____
Signature of Agent (Registered Representative)

X _____
Signature of Owner if not Proposed Insured or Applicant.
(If a corporation, show firm's name and signature of authorized officer.)

EV4-200Y-J

4

# LARGE AMOUNT SUPPLEMENT

To: ☐ The Equitable Life Assurance Society of the United States

☒ Equitable Variable Life Insurance Company

☐ The Equitable of Colorado, Inc.

Instructions: Complete Section I _and_ applicable Section(s) II (Personal Insurance) or III (Business Insurance).

PROPOSED INSURED'S
NAME _Marlene Charlotte Shuster_    ASU (Alpha)/App. No. _PPA_
First       Middle       Last

## Section I - General Information
### (Complete in all instances)

**A. Insurance In Force (All Companies)**

| Purpose | Face Amount |
|---|---|
| Personal | $ _100,000_ |
| Business | $ _none_ |
| Total In Force | $ _200,000_ |

**B. Insurance Applied For (All Companies)**

Face Amount

$ _1,964,000_

$ _____

Amount applied for elsewhere is ☐ competitive ☐ additional.

**C. Financial Information:**

1. Income:

Gross Annual Compensation:
(e.g. Salary, Commissions, Bonuses, etc.)    $ REDACTED    $ REDACTED

Gross Annual Investment and Other Income:
(e.g. Dividends, Interest, Net Real Estate Income, etc.)    $ REDACTED    $ REDACTED

Total Cash Income before taxes    $ REDACTED    $ REDACTED

REDACTED

2. Net Personal Worth:

Assets:    $ REDACTED

Liabilities (including mortgages):    $ _____

Net Worth:    $ _____

## Section II - Personal Insurance
### (Complete only when applying for Personal Insurance)

Purpose: (Check appropriate box(es) and answer all supplemental questions.)

☒ Family Income    ☐ Education Fund

☐ Gift    ☐ Mortgage Protection

☐ Personal Loan Collateral (other than mortgage protection): Answer supplemental questions under Business Loan Collateral in Section III, C3.

☐ Estate Settlement

Taxable Estate $ _____

Estimated Settlement Costs (taxes and administration expenses) $ _____

Total Liquid Assets $ _____

☒ Other (specify) _Retirement Income_
_$180,000 is being_
_Deposited - these the_
_Death Benefit is 1,964,000_

The above statements and answers are true and complete to the best of my knowledge and belief. I agree that such statements and answers shall be made part of the application for insurance or request for policy change or reinstatement, as the case may be. The Insurer may rely on them in acting on this application.

Dated at _____ on _1 / 25 / 19 93_
(City)    (State)

M.S. X _____
Signature of Proposed Insured, or Applicant if Proposed Insured is a Child

Witnessed by: _____
Signature of Agent

180-300C    (Rev. 6/87)

**Application Part 2 To:** ☒ **The Equitable Life Assurance Society of the United States**
☐ **Equitable Variable Life Insurance Company**
☐ **The Equitable of Colorado, Inc.**

Reason for submission of this form:  ☐ New Policy   ☐ Policy Change   ☐ Reinstatement

| | First Name | Middle Initial | Last Name | | |
|---|---|---|---|---|---|
| **1. a.** Proposed Insured *(Please Print)* | ARLENE | | SHUSTER | **b.** Height: 5 ft. 1½ in. | **c.** Weight: 132 lbs. |
| | | | | **d.** Birth Date: Mo. 4 Day 26 Yr. 45 | |
| | | | | **e.** ☐ Male  ☒ Female | |

**2. a.** Name and address of personal physician (or medical facility used instead): *(If none, so state)* _____ REDACTED

**b.** Date and reason last consulted if within the last 5 years _____ REDACTED

**c.** What treatment was given or recommended? *(If none, so state)* _____

REDACTED

180-M205N                                                                                           (Ed. 6-89)

# EQUITABLE
**VARIABLE LIFE INSURANCE COMPANY**

A Stock Life Insurance Company
Home Office: 787 Seventh Avenue, New York, New York 10019-6018

Flexible Premium Variable Life Insurance Policy. Insurance payable upon death before Final Policy Date. Policy Account payable on Final Policy Date. Adjustable Death Benefit. Premiums may be paid while insured person is living and before the Final Policy Date. Premiums must be sufficient to keep the policy in force. Values provided by this policy are based on declared interest rates, and on the investment experience of the investment divisions of a separate account which in turn depends on the investment performance of the corresponding portfolios of investment companies. They are not guaranteed as to dollar amount. Investment options are described on Page 10. This is a non-participating policy.

No. 90-300PA

COPY

# EXHIBIT B

NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES
FINANCIAL FRAUD & CONSUMER PROTECTION DIVISION
--------------------------------------------------------------------------------X

In the Matter of

AXA Equitable Life Insurance Company,

                              Respondent.

--------------------------------------------------------------------------------X

## CONSENT ORDER

　　　　WHEREAS, in 2011, the New York State Department of Financial Services ("DFS" or
"Department")[1] commenced an investigation, pursuant to the New York Insurance Law, of AXA
Equitable Life Insurance Company ("AXA Equitable") concerning the implementation of the
AXA Tactical Manager strategy ("ATM Strategy") in its Separate Accounts (as defined below)
of existing policyholders (the "Investigation");

　　　　WHEREAS, DFS investigated whether AXA Equitable properly informed DFS regarding
the implementation of the ATM Strategy to its variable annuity contracts, including but not
limited to contracts with guaranteed benefits;

　　　　WHEREAS, the Investigation concluded that AXA Equitable failed to adequately inform
DFS and DFS's predecessor, the New York State Insurance Department ("NYSID") that it was
implementing its ATM Strategy in a manner that substantially changed its variable annuity
products;

---

[1] DFS was created by transferring the functions of the New York State Banking Department and the New York State
Insurance Department into a new agency. This transfer of functions became effective on October 3, 2011.

1

WHEREAS, this Consent Order contains DFS's findings and the relief agreed to by DFS and AXA Equitable;

NOW, THEREFORE, DFS and AXA Equitable are willing to resolve the matters cited herein in lieu of proceeding by notice and a hearing.

## FINDINGS

DFS's findings of the Investigation ("Findings") are as follows:

## RELEVANT ENTITY

1.    AXA Equitable was founded in 1859 and is headquartered in New York, New York. It is a subsidiary of AXA Equitable Financial Services, LLC, which is located in New York, New York. AXA Equitable offers various life insurance products including term life, universal life, and variable universal life insurance products, as well as variable and fixed annuities, to New York residents and customers throughout the rest of the United States.

## FACTUAL BACKGROUND

### AXA Equitable's Omissions from the NYSID

2.    In 2009, 2010, and 2011, AXA Equitable filed with the NYSID and DFS requests to amend and restate the Plans of Operation for Separate Accounts A, 45, 49, 65, 66, 70, 206, 301, I, and FP (the "Separate Accounts") pursuant to New York Insurance Law

§ 4240(e). Separate Accounts A, 45, and 49 are three of the accounts that contain AXA Equitable's variable annuity accounts, including but not limited to those with guaranteed benefits.[2]

3.     These filings, relating to the Plans of Operation, through which AXA Equitable introduced the ATM Strategy through new funds and existing funds, failed to inform and adequately explain to DFS the significance of the changes caused by introduction and application of the ATM Strategy to existing policyholders. For example, the filed requests to amend and restate the Plans of Operation did not address how existing policyholders who had not elected to invest in the ATM Strategy could end up invested in such funds.

4.     The ATM Strategy is designed to smooth funds' returns during periods of high market volatility. The ATM Strategy uses derivatives to reduce funds' equity exposure. AXA Equitable offers in all of its Separate Accounts, some of which contain assets from AXA Equitable's variable annuity policyholders with guaranteed benefits, investment options that invest in funds that utilize the ATM Strategy.

5.     However, the application of the ATM Strategy may, especially during highly volatile markets, limit the gains that may accrue to a policyholder's account without the ATM Strategy.

6.     Many policyholders invested in variable annuities, including variable annuities with guaranteed living and death benefits, because they were interested in making more

---

[2] A variable annuity is a tax-deferred retirement vehicle that allows the individual to choose from a selection of investments and then pays the individual a level of income in retirement that is determined by the performance of such investments. The investment options are typically mutual funds that invest in stocks, bonds, money market instruments, or some combination thereof. Variable annuities sometimes offer other features such as guaranteed benefits, which guarantee a particular minimum level of annuity payments even if the individual does not have enough money in the account (perhaps because of investment losses) to support that level of payments.

aggressive investments to capture market rises. These policyholders were comfortable taking such aggressive positions because they had purchased an annuity benefit guarantee that provided certain levels of benefits regardless of the performance of the selected investment options. Because such policyholders paid for a guarantee, they may have invested aggressively in hopes of increasing their account value and their income payments.

7.    In addition, the ATM Strategy may have the effect of suppressing the value of certain guarantee benefits that are eligible for periodic benefit base resets because the benefit base is only available for resets when the policyholder's account value rises.

8.    The changes effectively changed the nature of the product that the policyholders purchased, yet AXA did not explain in its filings to the Department that it was making such changes to its variable annuity products. The absence of detail and discussion in the filings regarding the significance of the implementation of the ATM Strategy had the effect of misleading the Department regarding the scope and potential effects of the ATM Strategy on the relevant funds and the possible consequences for policyholders.

9.    DFS approved the filings because it was led to believe that the changes were merely routine additions of funds and similar alterations. The Department approved the filings on that basis. Had the Department been aware of the extent of the changes, it may have required that the existing policyholders affirmatively opt in to the ATM Strategy.

## VIOLATIONS

10.    DFS finds that the foregoing acts and practices of AXA Equitable violate New York
Insurance Law § 4240(e).

11.    AXA Equitable violated New York Insurance Law § 4240(e) by filing the Plans of
Operation with the NYSID and DFS without adequately informing and explaining to the
Department the significance of the changes to the insurance product.

## AGREEMENT

### I.    Civil Fine

12.    No later than April 1, 2014, AXA Equitable shall pay a civil fine pursuant to N.Y. Ins.
Law § 109 in the amount of $20,000,000 to the New York State Department of Financial
Services to address the foregoing conduct by AXA Equitable. The payment shall be in
the form of a wire transfer in accordance with DFS instructions or a certified or bank
check made payable "New York State Department of Financial Services" and mailed to:
New York State Department of Financial Services, One State Street, New York, New
York, 10004-1511, Attention: Joy Feigenbaum, Executive Deputy Superintendent,
Financial Frauds & Consumer Protection.

### II.    Indemnification

13.    Neither AXA Equitable, nor any of its parents or affiliates shall, collectively or
individually, seek or accept, directly or indirectly, reimbursement or indemnification,
including, but not limited to, payment made pursuant to any insurance policy, with regard
to any or all of the amounts payable pursuant to Section I of this Consent Order.

### III.   Other Relief

14.   AXA Equitable agrees to seek all necessary approvals with regard to New York
Insurance Law § 4240(e), and will provide Department-approved communications to
policyholders when AXA Equitable is revising fund choices in connection with the ATM
Strategy, and comply with any other conditions placed on any such approvals.

15.   AXA Equitable will issue a written report to DFS concerning changes to the Plan of
Operations for Separate Accounts A, 45, and 49 and respond to the Department's
questions thereon on a quarterly basis for a period of five years from the date of this
agreement.

16.   AXA Equitable admits to the authority of DFS to effectuate this Consent Order.

### IV.   Breach of the Consent Order

17.   In the event that DFS believes that AXA Equitable has materially breached this Consent
Order, DFS will provide written notice of such breach to AXA Equitable and AXA
Equitable must, within ten (10) business days from the date of receipt of said notice, or
on a later date if so determined in the sole discretion of DFS, appear before DFS and have
an opportunity to rebut the evidence, if any, on the issue of whether a breach has occurred
and, to the extent pertinent, to demonstrate that any such breach is not material or has
been cured.

### V.   Other Provisions

18.   If AXA Equitable defaults on its monetary obligations under this Consent Order, DFS
may terminate this Consent Order, at its sole discretion, upon ten (10) days' written
notice to AXA Equitable.  In the event of such termination, AXA Equitable expressly
agrees and acknowledges that this Consent Order shall in no way bar or otherwise

6

preclude DFS from commencing, conducting, or prosecuting any investigation, action, or proceeding, however denominated, related to the Consent Order, against it, or from using in any way the statements, documents, or other materials produced or provided by AXA Equitable prior to or after the date of this Consent Order, including, without limitation, such statements, documents, or other materials, if any, provided for purposes of settlement negotiations, except as may otherwise be provided in a written agreement with DFS.

19.    DFS has agreed to the terms of this Consent Order based on, among other things, the representations made to DFS by AXA Equitable and/or its counsel in connection with DFS's Investigation and the Findings of the Investigation. To the extent that representations made by AXA Equitable or its counsel are later found to be materially incomplete or inaccurate, this Consent Order is voidable by DFS in the Superintendent's sole discretion.

20.    AXA Equitable shall, upon request by DFS, provide all documentation and information reasonably necessary for DFS to verify compliance with this Consent Order.

21.    All notices, reports, requests, and other communications to any party pursuant to this Consent Order shall be in writing and shall be directed as follows:

If to DFS:

New York State Department of Financial Services
One State Street
New York, New York 10004-1511
Attention: Christopher B. Mulvihill, Senior Counsel to the Superintendent,
Michael Maffei, Assistant Deputy Superintendent and Life Bureau Chief

If to AXA Equitable:

AXA Equitable Life Insurance Company
1290 Avenue of the Americas

7

New York, New York 10104
Attention: Kermitt Brooks, Managing Director and Associate General Counsel

with a copy to:

Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Attention: Eric R. Dinallo/Mark P. Goodman, Esqs.

22.    This Consent Order and any dispute thereunder shall be governed by the laws of the State

of New York without regard to any conflicts of laws principles.

23.    AXA Equitable waives its right to further notice and hearing in this matter as to any

allegations of past violations up to and including the Effective Date of this Consent Order

and agree that no provision of this Consent Order is subject to review in any court or

tribunal.

24.    This Consent Order may not be amended except by an instrument in writing signed on

behalf of all parties to this Consent Order.

25.    In the event that one or more provisions contained in this Consent Order shall for any

reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality,

or unenforceability shall not affect any other provision of this Consent Order.

26.    This Consent Order may be executed in one or more counterparts, and shall become

effective when such counterparts have been signed by each of the parties hereto and

approved by the Superintendent of Financial Services or his designee.

27.    Upon execution by the parties to this Consent Order, DFS will discontinue the

Investigation as and against AXA Equitable solely with respect to subject matter of the

Investigation.

8

**VI.**    **Entire Agreement**

28.    This Consent Order constitutes the entire agreement between DFS and AXA Equitable
and supersedes any prior communication, understanding, or agreement, whether written
or oral, concerning the subject matter of this Consent Order.  No representation,
inducement, promise, understanding, condition, or warranty not set forth in this Consent
Order has been relied upon by any party to this Consent Order.

29.    The Effective Date of this Consent Order is the date on which it shall have been approved
by the Superintendent of Financial Services.

9

**WHEREFORE,** the signatures evidencing assent to this Consent Order have been affixed hereto on the dates set forth below.

Dated: March 17, 2014

DEPARTMENT OF FINANCIAL SERVICES

By: _____
Joy Feigenbaum
Executive Deputy Superintendent
Financial Frauds & Consumer Protection

March 17, 2014

AXA Equitable Life Insurance Company

By: _____
Anthony F. Recine
Managing Director and Deputy General Counsel of
AXA Equitable

March 13, 2014

THE FOREGOING IS HEREBY APPROVED.
IT IS SO ORDERED.

Dated: New York, New York
March 17, 2014

_____
BENJAMIN M. LAWSKY
Superintendent of Financial Service

10

**Appendix XII-B1**

| | CIVIL CASE INFORMATION STATEMENT (CIS) | FOR USE BY CLERK'S OFFICE ONLY |
|---|---|---|



### CIVIL CASE INFORMATION STATEMENT (CIS)

Use for initial Law Division
Civil Part pleadings (not motions) under *Rule* 4:5-1
**Pleading will be rejected for filing, under *Rule* 1:5-6(c), if information above the black bar is not completed or attorney's signature is not affixed**

FOR USE BY CLERK'S OFFICE ONLY
PAYMENT TYPE: ☐ CK ☐ CG ☐ CA
CHG/CK NO.
AMOUNT:
OVERPAYMENT:
BATCH NUMBER:

| ATTORNEY / PRO SE NAME | TELEPHONE NUMBER | COUNTY OF VENUE |
|---|---|---|
| Sung-Min Lee | (914) 997-0500 | Camden |

FIRM NAME (if applicable)
Lowey Dannenberg Cohen & Hart, P.C.

FILED
NOV 17 2014

DOCKET NUMBER (when available)
L-4485-14

OFFICE ADDRESS
One North Broadway, Suite 509,
White Plains, NY 10601

DOCUMENT TYPE
Summons and Complaint

JURY DEMAND ☒ YES ☐ No

| NAME OF PARTY (e.g., John Doe, Plaintiff) | CAPTION |
|---|---|
| ARLENE SHUSTER | ARLENE SHUSTER, on behalf of herself and all others similarly situated v. AXA EQUITABLE LIFE INSURANCE COMPANY |

| CASE TYPE NUMBER (See reverse side for listing) | HURRICANE SANDY RELATED? | IS THIS A PROFESSIONAL MALPRACTICE CASE? ☐ YES ☒ NO |
|---|---|---|
| 599 | ☐ YES ☒ NO | IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53 A -27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |

RELATED CASES PENDING?
☐ Yes ☒ No

IF YES, LIST DOCKET NUMBERS

DO YOU ANTICIPATE ADDING ANY PARTIES
(arising out of same transaction or occurrence)?
☐ Yes ☒ No

NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (if known)
☐ NONE
☒ UNKNOWN

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP? ☐ Yes ☒ No | IF YES, IS THAT RELATIONSHIP: ☐ EMPLOYER/EMPLOYEE ☐ FAMILIAL | ☐ FRIEND/NEIGHBOR ☐ BUSINESS | ☐ OTHER (explain) |
|---|---|---|---|

DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY? ☐ Yes ☒ No

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION

| DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS? ☐ Yes ☒ No | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
|---|---|
| WILL AN INTERPRETER BE NEEDED? ☐ Yes ☒ No | IF YES, FOR WHAT LANGUAGE? |

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).

ATTORNEY SIGNATURE:

Effective 08-19-2013, CN 10517-English

page 1 of 2

**Side 2**

# CIVIL CASE INFORMATION STATEMENT
## (CIS)
### Use for initial pleadings (not motions) under *Rule* 4:5-1

**CASE TYPES** (Choose one and enter number of case type in appropriate space on the reverse side.)

**Track I - 150 days' discovery**
151  NAME CHANGE
175  FORFEITURE
302  TENANCY
399  REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction)
502  BOOK ACCOUNT (debt collection matters only)
505  OTHER INSURANCE CLAIM (including declaratory judgment actions)
506  PIP COVERAGE
510  UM or UIM CLAIM (coverage issues only)
511  ACTION ON NEGOTIABLE INSTRUMENT
512  LEMON LAW
801  SUMMARY ACTION
802  OPEN PUBLIC RECORDS ACT (summary action)
999  OTHER (briefly describe nature of action)

**Track II - 300 days' discovery**
305  CONSTRUCTION
509  EMPLOYMENT (other than CEPA or LAD)
599  CONTRACT/COMMERCIAL TRANSACTION
603N AUTO NEGLIGENCE – PERSONAL INJURY (non-verbal threshold)
603Y AUTO NEGLIGENCE – PERSONAL INJURY (verbal threshold)
605  PERSONAL INJURY
610  AUTO NEGLIGENCE – PROPERTY DAMAGE
621  UM or UIM CLAIM (includes bodily injury)
699  TORT – OTHER

**Track III - 450 days' discovery**
005  CIVIL RIGHTS
301  CONDEMNATION
602  ASSAULT AND BATTERY
604  MEDICAL MALPRACTICE
606  PRODUCT LIABILITY
607  PROFESSIONAL MALPRACTICE
608  TOXIC TORT
609  DEFAMATION
616  WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES
617  INVERSE CONDEMNATION
618  LAW AGAINST DISCRIMINATION (LAD) CASES

**Track IV - Active Case Management by Individual Judge / 450 days' discovery**
156  ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION
303  MT. LAUREL
508  COMPLEX COMMERCIAL
513  COMPLEX CONSTRUCTION
514  INSURANCE FRAUD
620  FALSE CLAIMS ACT
701  ACTIONS IN LIEU OF PREROGATIVE WRITS

**Multicounty Litigation (Track IV)**

| | | | |
|---|---|---|---|
| 266 | HORMONE REPLACEMENT THERAPY (HRT) | 288 | PRUDENTIAL TORT LITIGATION |
| 271 | ACCUTANE/ISOTRETINOIN | 289 | REGLAN |
| 274 | RISPERDAL/SEROQUEL/ZYPREXA | 290 | POMPTON LAKES ENVIRONMENTAL LITIGATION |
| 278 | ZOMETA/AREDIA | 291 | PELVIC MESH/GYNECARE |
| 279 | GADOLINIUM | 292 | PELVIC MESH/BARD |
| 281 | BRISTOL-MYERS SQUIBB ENVIRONMENTAL | 293 | DEPUY ASR HIP IMPLANT LITIGATION |
| 282 | FOSAMAX | 295 | ALLODERM REGENERATIVE TISSUE MATRIX |
| 284 | NUVARING | 296 | STRYKER REJUVENATE/ABG II MODULAR  HIP STEM COMPONENTS |
| 285 | STRYKER TRIDENT HIP IMPLANTS | 297 | MIRENA CONTRACEPTIVE DEVICE |
| 286 | LEVAQUIN | 601 | ASBESTOS |
| 287 | YAZ/YASMIN/OCELLA | 623 | PROPECIA |

**If you believe this case requires a track other than that provided above, please indicate the reason on Side 1, in the space under "Case Characteristics.**

**Please check off each applicable category**   ☒ **Putative Class Action**   ☐ **Title 59**

```
CAMDEN COUNTY
SUPERIOR COURT
HALL OF JUSTICE
CAMDEN          NJ 08103
                                    TRACK ASSIGNMENT NOTICE
COURT TELEPHONE NO. (856) 379-2200
COURT HOURS  8:30 AM - 4:30 PM
                .
                        DATE:   NOVEMBER 25, 2014
                        RE:     SHUSTER VS AXA EQUITABLE LIFE INSURANCE COMPANY
                        DOCKET: CAM L -004485 14

    THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 2.

    DISCOVERY IS   300 DAYS AND RUNS FROM THE FIRST ANSWER OR 90 DAYS
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

    THE PRETRIAL JUDGE ASSIGNED IS:  HON LOUIS R. MELONI

    IF YOU HAVE ANY QUESTIONS, CONTACT TEAM     302
AT:  (856) 379-2200 EXT 3080.

    IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
    PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                        ATTENTION:
                                ATT: SUNG-MIN LEE
                                LOWEY DANNENBURG COHEN & HART
                                1 NORTH BROADWAY
                                5TH FLOOR
                                WHITE PLAINS     NY 10601
JUAXT5
```