NOT FOR PUBLICATION                                                                (Doc. No. 11)


IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| ARLENE SHUSTER, | : |
| Plaintiff, | : Civil No. 14-8035 (RBK/JS) |
| v. | : **OPINION** |
| AXA EQUITABLE LIFE INSURANCE COMPANY, | : |
| Defendant. | : |

**KUGLER**, United States District Judge:

This matter comes before the Court on the Motion for Remand to State Court of Plaintiff Arlene Shuster ("Shuster"). (Doc. No. 11.) Shuster brings what she claims is a state law breach of contract class action, filed on behalf of herself and similarly situated plaintiffs who were harmed by the acts of Defendant AXA Equitable Life Insurance Company ("AXA") when it allegedly violated New York law by implementing an investment strategy for certain investment accounts without properly obtaining approval from the New York State Department of Financial Services ("DFS"). AXA not only opposes Plaintiff's Motion for Remand, but also asks that the Court dismiss Plaintiff's action for lack of subject matter jurisdiction. It contends that this case is precluded by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. § 78bb, and Shuster's claims must be dismissed pursuant to § 78bb(f)(1). Shuster maintains that remand is appropriate because the purported state law claims are not subject to preclusion under

SLUSA. For the reasons set forth below, the Court will grant Shuster's Motion for Remand, and will remand this case to the Superior Court of New Jersey, Law Division, Camden County.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Shuster is an individual residing in Cherry Hill, New Jersey. (Compl. ¶ 3.) AXA is a New York-based company that is authorized to write life insurance, annuities, and accident and health insurance products. (Id. ¶ 6.)

In 1993 Shuster purchased a Flexible Premium Variable Life Insurance Policy (the "Policy") from AXA's predecessor. (Id. ¶¶ 3-5.)[1] In addition to paying a death benefit, a variable life insurance policy allows the policy holder to allocate a portion of the premium dollars for investment. (Id. ¶ 9.) In this case, the premiums that Shuster paid were placed into the "Policy Account" after deductions for expenses. (Id. ¶ 11.) At Shuster's direction, the net amount in the Policy Account could then be allocated to the Guaranteed Interest Division (the "GID") and/or the Separate Account. (Id. ¶ 12.) Funds in the GID earn interest at a guaranteed rate that AXA declares each year, which must not be less than 4%, and the principal in the GID is also guaranteed. (Id. ¶ 13.) The Separate Account consists of investment divisions, and each division may invest its assets in a separate class of shares of an investment company. (Id. ¶ 14.) Each class represents a separate portfolio in the investment company. (Id.) On April 20, 2009, Shuster reallocated proceeds in her Policy Account to different funds in AXA's Separate Account, including: (i) EQ/Equity Growth PLUS; (ii) EQ/Mid Cap Value PLUS; and (iii) EQ/PIMCO Ultra Short Bond. (Id. ¶ 18.)

---

[1] In order to purchase the Policy, Shuster made an initial premium payment of $100,000 in 1993 and another $100,000 payment the following year. (Compl. ¶ 4.)

The Policy contained a provision which required that AXA comply with all applicable laws, including New York law, in operating the Separate Account and the investment divisions comprising the Separate Account.  (Id. ¶ 20.)[2]  For instance, it incorporated a provision of New York law requiring that the investment policy of the investment division of the Separate Account not be changed unless a proposed change is approved by the Superintendent of Insurance of New York, or otherwise deemed approved in accordance with New York insurance law.  (Id. ¶ 22.)

Under New York Insurance Law § 4240(e) there are different requirements for an insurer seeking to amend its operations depending on whether a proposed amendment "change[s] the investment policy of a separate account."  (Id. ¶ 24.)  Where the proposed amendment does not change the investment policy, it is deemed approved 30 days after the insurer files it.  (Id.)  If, on the other hand, an amendment does change the investment policy, it will not be deemed approved automatically and will be treated as an original filing.  (Id.)  Then the change must be approved by the Superintendent of Insurance.  (Id. ¶ 22.)  In other words, AXA had no authority under New York insurance law, and therefore no right under the Policy, to introduce an amendment that changed the investment policy in the Separate Account or investment divisions in the Separate Account without properly obtaining approval from the Superintendent of Insurance.  (See id. ¶ 26.)

In 2010 AXA implemented a "volatility-management strategy" to the three funds Shuster reallocated her proceeds to in 2009, as well as to other investment divisions in the Separate Account (collectively the "Affected Funds").  (Id. ¶¶ 17, 19.)[3]  Rather than present the volatility-

---

[2] In a section of the Policy titled "Our Separate Account (SA)," AXA represented that the Separate Account was established and maintained under New York law.  (Compl. ¶ 21.)

[3] A volatility-management strategy is an investment strategy that might invest in stocks or bonds except during periods of high market volatility, when a portfolio's holdings would be managed to limit exposure to volatility.  (See Ex. B to Compl, March 17, 2014, Consent Order ¶ 4.)  Such a strategy can limit the risk associated with downward

3

management strategy as a change to the investment policy for the Affected Funds, AXA presented it as a "routine" matter in its DFS filing. (Id. ¶ 28.) As a result, AXA's proposed amendments for the Affected Funds concerning the volatility-management strategy were automatically deemed approved. (Id.) The DFS subsequently found that AXA violated § 4240(e) of the New York Insurance Law in connection with its implementation of the volatility-management strategy. (Id. ¶ 29; see also Ex. B to Compl, March 17, 2014, Consent Order ("Consent Order").)

Shuster claims that AXA breached its contract with her, and the contracts of all others similarly situated, by implementing the volatility-management strategy without obtaining prior approval of the New York Superintendent of Insurance. (Id. ¶¶ 29, 37.) She further claims that she was damaged by this breach because AXA's implementation of the volatility-management strategy reduced the returns of the Affected Funds held by Shuster and other members of the class. (Id. ¶¶ 30, 39.)

On November 17, 2014, Shuster commenced this purported class action in the Superior Court of New Jersey, Law Division, Camden County. (Notice of Removal ("NOR") (Doc. No. 1) ¶ 1.) In her Complaint Shuster alleges one claim for breach of contract on behalf of herself and the purported class. (See generally Compl.) AXA was served with the Complaint on December 4, 2014, and timely removed the case to this Court on December 29, 2014. (See NOR.) In support of removal AXA relies on 15 U.S.C. § 78bb(f)(2), which permits removal of covered class actions, as defined in 15 U.S.C. § 78bb(f)(1). (NOR ¶ 3.) On the same day that

---

movement in the market, though it may also present a risk of underperformance if a portfolio's exposure to the market is limited during an upward movement in the market. (See Ex. 3 to Muscato Cert., Jan. 21, 2010, EQ Advisors Trust Supplement.)

AXA removed the case, it filed a Motion to Change Venue pursuant to 28 U.S.C. § 1404(a). (Doc. No. 4.)

Shortly after AXA's Notice of Removal was filed, Shuster filed the present Motion to Remand this action to state court. (Doc. No. 11.) The Court stayed AXA's pending Motion to Change Venue until Shuster's Motion for Remand was resolved. (Doc. No. 12.) In opposition to Shuster's Motion for Remand, AXA not only opposed this Motion, but asked that this Court dismiss her claim entirely pursuant to § 77bb(f)(1). (See Doc. No. 15.)

Because the parties have submitted briefs, replies, sur-replies, and unsolicited letters in support of their respective positions, the Court is confident that it is well-prepared to address the relevant issues with respect to the pending Motion. Accordingly, the Court will proceed to its discussion of the merits.

## II.   LEGAL STANDARD

Federal Courts are courts of limited jurisdiction and may only decide cases as authorized by the Constitution. Kokkonen v. Guardian Life Ins., 511 U.S. 375, 377 (1994). A case must be remanded if, at any time before final judgment, the district court discovers that it lacks subject matter jurisdiction to hear the case. See 28 U.S.C. § 1447(c). As the party removing the case, the defendant has the burden to prove that federal court jurisdiction is proper at all stages of the litigation. See Samuel–Bassett v. KIA Motors Am., Inc., 357 F.3d 392, 396 (3d Cir. 2004); Boyer v. Snap–On Tools Corp., 913 F.2d 108, 111 (3d Cir. 1990); Abels v. State Farm Fire & Cas. Co., 770 F.2d 26, 29 (3d Cir. 1985). The Court must resolve all contested issues of fact and uncertainties of law in favor of the plaintiff. See Boyer, 913 F.2d at 111. Moreover, the Court should strictly construe removal statutes and resolve all doubts in favor of remand. See Abels, 770 F.2d at 29.

Typically, the well-pleaded complaint rule requires that the face of the complaint provide the basis for federal question jurisdiction by raising issues of federal law, i.e., the basis for federal question jurisdiction must exist within the four corners of the complaint.  See City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 163 (1997).  Because a plaintiff is the master of his or her complaint, he or she "may avoid federal jurisdiction by exclusive reliance on state law." Caterpillar Inc. v. Williams, 482 U.S. 386, 392, 399 (1987).

SLUSA, however, provides an exception to the well-pleaded complaint rule.  See Rowinski v. Salomon Smith Barney Inc., 398 F.3d 294, 304 (3d Cir. 2005) ("SLUSA stands as an express exception to the well-pleaded complaint rule, and its preemptive force cannot be circumvented by artful drafting.")  It precludes a private party from bringing a "covered class action" in federal or state court, based on state law, alleging a "misrepresentation or omission of a material fact" or the use of "any manipulative or deceptive device or contrivance … in connection with the purchase or sale of a covered security."  15 U.S.C. § 78bb(f)(1).  Under SLUSA, the Court must inquire as to whether a "reasonable reading of the complaint evidences allegations of 'a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security.'"  Rowinski, 398 F.3d at 304 (citing § 78bb(f)(1)).

In order to remove a claim under SLUSA, the removing party must establish that the action is: (1) a covered class action, (2) that is based on state law, (3) alleging a misrepresentation or omission of a material fact or use of any manipulative or deceptive device or contrivance (4) "in connection with" or involving (5) the purchase or sale of a covered

6

security. Stephens v. Gentilello, 853 F. Supp. 2d 462, 467 (D.N.J. 2012) (citing Prager v. Knight/Trimark Grp., 124 F. Supp. 2d 229, 231 (D.N.J. 2000); § 78bb(f)(1)).[4]

## III. DISCUSSION

### a. SLUSA

When SLUSA was adopted it amended the Securities Exchange Act of 1934 to preclude a plaintiff from bringing securities class actions based upon violations of state law. See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 82 (2006). Specifically, SLUSA provides that:

> No covered class action[5] based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging--
>
> (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security;[6] or
>
> (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

---

[4] Moreover, SLUSA provides that any covered class action subject to removal under § 78bb(f)(2) is also subject to dismissal pursuant to § 78bb(f)(1). See Prager, 124 F. Supp. 2d at 231 (citing Burns v. Prudential Sec., 116 F. Supp. 2d 917, 920 n.1 (N.D. Ohio 2000)).

[5] SLUSA defines a "covered class action" as:

> [A]ny single lawsuit in which … one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members.

15 U.S.C. § 78bb(f)(5)(B)(i)(II). The parties do not dispute that this case is a "covered class action."

[6] Neither party disputes that this action concerns a covered security, i.e., the variable life insurance policy. See 15 U.S.C. § 78bb(f)(5)(E) ("The term 'covered security' means a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933 [15 U.S.C.A. § 77r(b)], at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred"); see also Securities Act Release No. 33-5360, [1972-1973 Decisions] Fed. Sec. L. Rep. (CCH), at *4 ("[T]he Commission has determined that a variable life contract would be a security."); Roth v. Am. Family Mut. Ins. Co., 567 F.3d 884, 886 (7th Cir. 2009) (explaining that variable life insurance policies are securities).

§ 78bb(f)(1).

As mentioned supra at Part II, SLUSA permits removal of any covered class action alleging a "misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." The scope of SLUSA preemption is not boundless, but courts are required to look beyond the omission of certain key words or legal theories in a complaint to determine whether the SLUSA "prerequisites are 'alleged' in one form or another." Rowinski, 398 F.3d at 300; see also id. ("[P]reemption does not turn on whether allegations are characterized as facts or as essential legal elements of a claim"). To otherwise allow artful pleading to undermine the goals of SLUSA would be "manifestly contrary to congressional intent." Id.

With respect to the determination of whether a misrepresentation has been alleged, the court in Rowinski counseled that "[w]here [ ] allegations of a material misrepresentation serve as the factual predicate of a state law claim, the misrepresentation prong is satisfied under SLUSA." Id.; see also LaSala v. Bordier et Cie, 519 F.3d 121, 141 (3d Cir. 2008) ("[W]hen one of a plaintiff's necessary facts is a misrepresentation, the plaintiff cannot avoid SLUSA by merely altering the legal theory that makes that misrepresentation actionable."); id. ("[W]hen an allegation of misrepresentation in connection with a securities trade, implicit or explicit, operates as a factual predicate to a legal claim, that ingredient is met.") Thus, though a misrepresentation or omission may not be an element of a breach of contract claim,[7] if it is an essential factual

---

[7] Though the Court need not determine which state's law would apply to Plaintiff's breach of contract claim at this time, it notes that the elements of a breach of contract claim are the same under both New Jersey and New York laws: (1) the existence of a contract; (2) breach of that contract; (3) damages flowing from the breach; and (4) that the plaintiff performed its own contractual obligations. See Call v. Czaplicki, Civ. No. 09-6561, 2010 WL 3724275, at *11 (D.N.J. Sept. 16, 2010) (listing elements of breach of contract claim under New Jersey law) (citing Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 210 F. Supp. 2d 552, 561 (D.N.J. 2002)); JP Morgan Chase v. J.H.

8

predicate of the claim, SLUSA preemption may attach. See Rowinski, 398 F.3d at 300; LaSala, 519 F.3d at 141 ("[W]hen … a plaintiff alleges that a misrepresentation made in connection with a securities trade breaches a contract, the plaintiff cannot avoid SLUSA preemption by arguing that misrepresentation is not an element of a breach-of-contract action.") However, "[t]o be a factual predicate, the fact of a misrepresentation must be one that gives rise to liability, not merely an extraneous detail." Id.; see id. (finding that where certain allegations of misrepresentation "need not have been alleged, and need not be proved," for the plaintiffs to prevail on certain claims, they were not factual predicates for the claims and were "merely background details.")

In order for a material misrepresentation to "matter" for purposes of SLUSA preemption, it must be made in connection with the decision to buy or sell a covered security. Chadbourne & Parke LLP v. Troice, — U.S. —, 134 S. Ct. 1058, 1066 (2014).[8] Though this provision should be given a broad interpretation by courts, it appears the "connection" prong of SLUSA preemption may only be met where the misrepresentation was "'material' to another individual's decision to 'purchase or sell' a statutorily defined … 'covered security.'" Id. at 169 (quoting Dabit, 547 U.S. at 75-77; S.E.C. v. Zandford, 535 U.S. 813, 822 (2002); Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc., 532 U.S. 588, 590-92 (2001); U.S. v. O'Hagan, 521 U.S. 642, 655-57 (1997); Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 10 (1971)). In other words, the purchase or sale of the covered security matters; whether the plaintiff "took, tried to take, or maintained an ownership position in the [covered security]

---

Elec. of New York, Inc., 893 N.Y.S. 2d 237, 239 (App. Div. 2010) (listing elements of breach of contract claim under New York law).

[8] This includes a plaintiff's decision to hold his or her covered securities "long beyond the point when, had the truth been known, they would have been sold." Troice, 134 S. Ct. at 1066 (quoting Dabit, 547 U.S. at 75).

through purchases or sales <u>induced by the fraud</u>." <u>Troice</u>, 134 S. Ct. at 1067 (emphasis added) (internal quotation marks omitted) (citing <u>Zanford</u>, 535 U.S. at 815, 820; <u>Dabit</u>, 547 U.S. at 76, 85, 89.)

Though issued prior to both <u>Troice</u> and <u>Dabit</u>, the Third Circuit's decision in <u>Rowinski</u> sets forth several relevant factors that may inform the Court's analysis of whether a particular allegation of misrepresentation satisfies the "in connection" prong. They include: (1) whether the covered class action alleges a fraudulent scheme that coincides with the purchase or sale of securities; (2) whether the complaint alleges a material misrepresentation or omission disseminated to the public in a medium upon which a reasonable investor would rely; (3) whether the nature of the parties' relationship is such that it necessarily involves the purchase or sale of securities; and (4) whether the prayer for relief connects the state law claims to the purchase or sale of securities. <u>Rowinski</u>, 398 F.3d at 302 (internal quotation marks and citations omitted) (citing <u>Zandford</u>, 535 U.S. at 825; <u>Semerenko v. Cendant Corp.</u>, 223 F.3d 165, 176 (3d Cir. 2000); <u>Angelastro v. Prudential-Bache Sec., Inc.</u>, 764 F.2d 939, 944 (3d Cir. 1985)).

### b. Shuster's Claim

In her Motion for Remand, Shuster argues that not only does her breach of contract claim not allege a misrepresentation or omission made to her or other policyholders, any misrepresentation that may have been made by AXA was not "in connection with" the purchase or sale of covered securities. AXA counters that Shuster's Complaint is premised on an alleged misrepresentation by AXA to the DFS, and the inclusion of the DFS consent order necessarily incorporates such an allegation. Additionally, AXA claims that Shuster's claim must be read to allege a misrepresentation "in connection with" the purchase or sale of covered securities

because her Complaint must be read to suggest that Shuster would not have held on to certain covered securities had AXA not made a material misrepresentation.

### i. Whether Shuster alleges a misrepresentation or omission

In the Complaint Shuster never uses the terms "misrepresentation," "omission," "fraud," "lie," or anything of that kind. This does not, however, end the Court's inquiry. Though a misrepresentation may not be an essential legal element to Shuster's breach of contract claim, the Court must determine whether a misrepresentation forms a factual predicate for the claim.

The breach of contract claim in the Complaint is predicated on the allegation that AXA failed to comply with a term in the contract when it violated New York Insurance Law § 4240(e) by implementing the volatility management strategy without obtaining prior approval from the New York Superintendent of Insurance. (Compl. ¶ 37.) The Complaint does not specify how AXA failed to comply with New York law, other than to say that AXA presented the volatility-management strategy as a "routine" matter in its filing with the DFS, which led to AXA's proposal being automatically deemed approved after 30 days. (Id. ¶ 28.) It is also noted that the DFS independently found that AXA violated § 4240(e) of New York Insurance Law with its implementation of a volatility-management strategy for certain variable annuity products. (Id. ¶ 29.)[9]

Looking beyond the allegations, it is clear that AXA's misrepresentation is an essential predicate for the breach of contract claim. In order to prove the breach of contract claim, the class needs to show that AXA violated New York Insurance Law, and thereby breached the

---

[9] Shuster relies on the attached Consent Order to support the allegation that DFS found AXA violated N.Y. Ins. Law § 4240(e). (Compl. ¶ 29 (citing Consent Order)); see also Consent Order ¶ 11 ("[AXA] violated New York Insurance Law § 4240(e) by filing the Plans of Operation with the NYSID and DFS without adequately informing and explaining to the Department the significance of the changes to the insurance product").)

...

contract (the Policy). Shuster claims that AXA failed to properly report its implementation of the volatility-management strategy to the DFS. AXA did this by presenting the change as "routine," something other than a change in the investment policy for the Separate Account, in order to obtain automatic approval from the DFS. In other words, this Complaint requires the class to show that AXA misled DFS in its filing in order to prove that AXA in fact violated New York Insurance Law, and thereby breached the contract.

Because it appears that the class would be required to prove a misrepresentation by AXA in order to sustain the breach of contract claim, the Court finds that the misrepresentation is one "giving rise to liability," and not "merely an extraneous detail." LaSala, 519 F.3d at 141.[10]

### ii. Whether the alleged misrepresentation was "in connection with" the purchase or sale of a covered security

Though the Court finds that Shuster's proposed class action is predicated on a misrepresentation made by AXA, the Court finds that it is not clear this misrepresentation was made "in connection with" the purchase or sale of a covered security.

Shuster claims that AXA's nonpublic filing with the DFS did not induce her or any other policyholder "to purchase, sell, or maintain their [holdings]." (Pl.'s Br. at 11.) She purchased her insurance contract nearly two decades before the events in question, and invested in three of the Affected Funds prior to AXA's implementation of the volatility-management strategy in those funds. (Id. at 14.) Due to the nonpublic nature of AXA's filings, Shuster asserts that she

---

[10] AXA has also urged that the Complaint asserts that AXA engaged in a "manipulative or deceptive device or contrivance." § 78bb(f)(1)(B). The Court need not address this argument, because the Court finds the Complaint does not allege that AXA's conduct occurred "in connection with the purchase or sale" of covered securities, which applies equally to §§ 78bb(f)(1)(A) and (B). See infra Part III.b.ii.

12

was not induced to sell or retain her investments in the Affected Accounts based on AXA's actions. (Pl.'s Rep. Br. at 3.)

Relying primarily on the Consent Order attached to the Complaint, AXA argues that the Complaint "must be read to suggest that had [AXA] not made those alleged misrepresentations to [the DFS], [Shuster] would have made a different investment decision at the point in time when volatility management was introduced, either by reallocating her account value within the separate account to other investment alternatives, or by withdrawing cash from her policy (or even surrendering it entirely)." (Def.'s Opp'n at 20-21.)[11]  AXA's re-imagination of Shuster's claim is a bridge too far, even under SLUSA's broad rules of interpretation.

---

[11] AXA also repeatedly draws the Court's attention to the litigation in Zweiman v. AXA Equitable, 14-5012 (VSB) (removed to the S.D.N.Y. on July 3, 2014) ("Zweiman"), which is pending in the Southern District of New York. (See, e.g., NOR ¶¶ 5-19; Def.'s Opp'n at 11-13, 15-16, 17-19.)  Despite some of the similarities between the two cases, AXA does not offer a compelling reason for why this Court should base its present decision to remand or dismiss this case on the proceedings taking place before a different judge, in a different court, between different parties, with (slightly) different claims.

The cases cited by AXA in support of its suggestion that this Court look to the Zweiman litigation, Dudek v. Prudential Securities, Inc., 295 F.3d 875 (8th Cir. 2002) and Montoya v. N.Y. State United Teachers, 754 F. Supp. 2d 466 (E.D.N.Y. 2010), are inapposite.  In each of these cases the plaintiffs that filed multiple actions were the same parties in the prior and subsequent litigation.  Dudek involved a class action originally brought in New York state court, removed to the Southern District of New York, voluntarily dismissed by the plaintiffs to avoid "disputed threshold issues of personal jurisdiction," and refiled in Iowa state court, where it was again removed by the defendant.  295 F.3d at 879.  Though the Iowa district court noted the similarities in the two complaints when it dismissed the action under SLUSA, it is significant that the plaintiffs had represented to the Southern District of New York court that, by voluntarily dismissing the case, they would "'protect[ ] the interests of the Class by refiling essentially the same action on behalf of the class' in Iowa state court."  Id.  There is no indication here that Shuster (or any other AXA variable life insurance policy holders) previously filed suit in another court and is merely refiling this action for personal jurisdiction reasons, with "essentially the same" substance as her prior allegations.  Id.  In Montoya the plaintiffs' first lawsuit against the defendants, filed in the Southern District of New York and alleging ERISA violations, was dismissed because the court found the annuity programs at issue were statutorily exempt and that it lacked subject matter jurisdiction under ERISA.  745 F. Supp. 2d at 469-70.  The plaintiffs refiled their action in New York state court, omitting the references to ERISA but otherwise retaining the same general allegations.  Id. at 470.  The defendants removed the second case to the Southern District of New York and the court found that the plaintiffs' complaint was precluded under SLUSA.  Id. at 474.  It was not the case in Montoya that the plaintiffs faced dismissal under SLUSA in their first action and merely refiled in state court with amended allegations to avoid dismissal.  Nor is it clear how this factual scenario helps AXA draw the Court's attention to the Zweiman litigation.

Maybe AXA means to invoke the first-filed rule?  However, the first-filed rule, applied by the Third Circuit to "litigation that involves the same subject matter" in hopes of reducing "multiple conflicting decisions which may require separate appeals," is discretionary, and not mentioned in AXA's filings.  Time Warner Cable, Inc. v. USA Video Tech. Corp., 520 F. Supp. 2d 579, 585-86 (D. Del. 2007); see E.E.O.C. v. Univ. of Pa., 850 F.2d 969, 971-72

Examining the factors set forth in Rowinski, the Court finds that the "in connection with" requirement is missing from Shuster's Complaint. First, this class action does not allege a fraudulent scheme that "coincides with the purchase or sale of securities." Rowinski, 398 F.3d at 302.

On the face of the Complaint, there is no indication that the breach of contract claim involves the purchase or sale of covered securities. The claim relates to members of a class who allocated their own investments to the Affected Funds in the Separate Account, and AXA subsequently implemented a volatility-management strategy for those Affected Funds. (Compl. ¶ 32.) When AXA allegedly breached the contract by implementing the volatility-management strategy without properly presenting it to the DFS the members of the class were harmed by the reduction to their benefits due to the more conservative investing employed under the volatility-management strategy. (Id. ¶ 39.) Shuster's Complaint includes several charts indicating how the Affected Funds performed with the volatility-management strategy in place, and how they might have performed without the volatility-management strategy. (Id. ¶ 31.)

The only way to connect these allegations to a purchase or sale of covered securities is to assume that Shuster and the members of the class would have been presented with the option to maintain their investments in the Affected Funds or transfer their money to other investment

---

(3d Cir. 1988) aff'd, 493 U.S. 182 (1990) (stating that "[d]istrict courts have always had discretion to retain jurisdiction given appropriate circumstances justifying departure from the first-filed rule."); see also id. at 974 ("forbearance exercised by coordinate federal courts is discretionary") (citing Kline v. Burke Constr. Co., 260 U.S. 226, 229 (1922)). And perhaps AXA is frustrated that it is faced with litigation in multiple fora at one time? Yet, the Court is not empowered to strip this plaintiff of her rights to litigate her case in the forum of her choosing merely because she is using the assistance of the same counsel that has appeared in other cases similar to this one in other courts.

AXA's inundation of references to Zweiman is generally unhelpful. If Judge Broderick decides dismissal under SLUSA is appropriate in Zweiman, it will undoubtedly be because the allegations in that complaint and his considerations of the law led to that conclusion. It will not, however, have a bearing on whether Shuster's Complaint should be remanded or dismissed in this case.

14

divisions within the Separate Account when the DFS reviewed AXA's proposed volatility-management strategy for the Affected Funds.  Though AXA argues that certain language in the Consent Order ineluctably leads to this conclusion, its reasoning faces two roadblocks for which it has no solutions.[12]

---

[12] In support of their argument, Defendants also rely on: Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71 (2006); Chadbourne & Parke LLP v. Troice, — U.S. —, 134 S. Ct. 1058 (2014); In re Mut. Funds Inv. Litig., 437 F. Supp. 2d 439 (D. Md. 2006), aff'd, 309 Fed. App'x 722 (4th Cir. 2009); and Rabin v. JPMorgan Chase Bank, N.A., Civ. No. 06-5452, 2007 WL 2295795 (N.D. Ill. Aug. 3, 2007).  These cases do not alter the Court's analysis of whether a misrepresentation or omission was made "in connection with" the decision to purchase, sell, or hold a covered security.

Dabit eliminated any distinction between plaintiffs that were induced to purchase or sell covered securities as a result of a misrepresentation and those who merely held on to covered securities as a result of a misrepresentation for purposes of SLUSA preclusion.  547 U.S. at 87, 89.  It still, however, involved an allegation that the defendant's "misrepresentations and manipulative tactics caused [plaintiffs] to hold onto overvalued securities," long after they otherwise would have sold those securities.  Id. at 75-76.  Thus, even the broad reading of "in connection with the purchase or sale of a covered security" requires a fraud that "'coincide[s]' with a securities transaction—whether by the plaintiff or by someone else," id. at 85 (emphasis added) (quoting O'Hagan, 521 U.S. at 651), including the decision to "retain or delay selling their securities."  Dabit, 547 U.S. at 77.  The holding in Dabit is unhelpful here where the allegations do not suggest that the class of plaintiffs held on to the covered securities until long after they would have otherwise due to AXA's misrepresentation.  There is no allegation of an actual or implied covered security transaction in this Complaint.

In Troice the plaintiffs complained that they purchased uncovered securities when the defendants misrepresented that those uncovered securities were backed by covered securities.  134 S. Ct. at 1062.  The issue was ultimately whether that situation involved a misrepresentation in connection with a covered security, but the Supreme Court stated in no uncertain terms that "[a] fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'"  Id. at 1066 (emphasis added).  Thus, "[t]he phrase 'material fact in connection with the purchase or sale' suggests a connection that matters. … [A] connection matters where the misrepresentation makes a significant difference to someone's decision to purchase or to sell a covered security."  Id. (emphasis added); see also id. at 1067 (noting that each of the prior cases cited by the dissent "involved a victim who took, tried to take, or maintained an ownership position in the statutorily relevant securities through 'purchases' or 'sales' induced by the fraud.")  Rather than supporting AXA's reading of the statute, this appears to clearly support the Court's finding that SLUSA preemption requires the misrepresentation not only be made in connection with a covered security, but in connection with the purchase or sale of a covered security.

Upon review, In re Mut. Funds Inv. Litig. and Rabin are also inapposite.  In In re Mut. Funds Inv. Litig. the court determined that SLUSA preclusion applied because "the alleged harm to the plaintiffs' investments arose from the purchase and sale of sub-account [covered securities] at stale (i.e., misrepresented) prices."  437 F. Supp. 2d at 444.  Relying on Dabit, the court noted that it did not matter that the plaintiffs themselves were not the ones engaged in purchasing or selling the covered securities, but only that the misrepresentation occurred in connection with a purchase or sale.  Id. (citing Dabit, 547 U.S. at 89); but see Troice, 134 S. Ct. at 1066 ("[T]he 'someone' making [the] decision to purchase or sell must be a party other than the fraudster.  If the only party who decides to buy or sell a covered security as a result of a lie is the liar, that is not a 'connection' that matters.")  Similarly, the plaintiffs in Rabin argued that, as beneficiaries of a trust managed by one of the defendants, they had no authority to purchase or sell covered securities and thus their claim that proceeds were invested in certain funds without their knowledge were not precluded under SLUSA.  2007 WL 2295795, at *1, 7.  The district court rejected this argument, noting

First, the Court is not required to adopt the entirety of the Consent order, all of its findings and conclusions, as part of Shuster's Complaint.[13] It is clear that Shuster attaches and cites the consent order as evidence that AXA in fact breached its obligations under New York Insurance Law. While the Consent Order dealt with AXA's implementation of a volatility-management strategy for certain variable annuity products, (see Consent Order at 1; id ¶ 2, n.2), the findings of the DFS in the Consent Order only appear to corroborate Shuster's allegations,

---

that the complaint alleged the defendants used misrepresentations and omissions in public filings and other disclosures to invest proceeds in their own proprietary mutual fund "despite better suited options," and while the plaintiffs themselves were never in a position to purchase or sell covered securities, the complaint alleged that the fraud occurred "in connection with the purchase or sale" of such securities. Id. at *7. In fact the plaintiffs actually pled that one of the defendants "purchased and sold shares of [covered securities]" without informing them, which formed the basis for their breach of fiduciary duty claim. Id. at *1. Though In re Mut. Funds Inv. Litig. and Rabin addressed the issue of conduct (whether someone was buying or selling covered securities pursuant to the alleged fraud), not identity (whether the plaintiffs had to be the ones making the decision to purchase or sell covered securities), the courts were not presented with the question of whether the defendants were in fact engaged in the purchase or sale of covered securities. Here there is no alleged transaction, and none of the facts indicate that a decision to purchase, sell, or hold covered securities was incidental to AXA's conduct.

[13] The Court is by no means required to adopt the entirety of the Consent Order as urged by AXA. See Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.), 768 F.3d 284, 290-91 (3d Cir. 2014) (stating that "the court may consider documents which are attached to or submitted with the complaint") (emphasis added) (quoting Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002)); see also Pryor, 288 F.3d at 560 ("Documents that the defendant attaches to the motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim; as such, they may be considered by the court.") (emphasis in original) (citing 27A Fed. Proc., L. Ed. § 62:466); see also 27A Fed. Proc., L. Ed. § 62:467, Commentary ("The principle that when a document contradicts a complaint to which it is attached, the document's facts or allegations trump those in the complaint, for purposes of a motion to dismiss for failure to state a claim, is only triggered upon a threshold determination of 'contradiction,' which only exists when the statements are inherently inconsistent").

Even if the Court were required to wholly incorporate the Consent Order into Shuster's Complaint, the SLUSA preclusion analysis would not be altered. AXA argues that Shuster "would have" invested differently at the point in time when the volatility-management strategy was made known. Not only is AXA's argument premised upon a counterfactual scenario, but it asks the Court to read equivocal dicta in the Consent Order as an inescapable pronouncement. This is nothing more than an attempt to rewrite Shuster's Complaint to fit AXA's own interests. The Court cannot find that the DFS's suggestions in the Consent Order of what it might have done for variable annuity holders contradicts the allegations in this Complaint.

Instead, after a review of the Complaint and the Consent Order it is clear that Shuster attached the Consent Order to her Complaint not to suggest that she would have purchased or sold covered securities had AXA been forthright with the DFS, but to support her claim that AXA breached the Policy when it violated N.Y. Ins. Law § 4240(e). See supra note 9. Because the Consent Order is consistent with the remainder of Shuster's allegations, the Court need not rewrite the Complaint into ruination.

16

and may be useful for proving the breach of contract claim at a later date.  There is no indication that the Consent Order referred to AXA's implementation of a volatility-management strategy for variable life insurance products, or that it applies to or binds Shuster and the proposed class members in any way.

      Second, AXA ignores, or rewrites, the actual language it relies upon in the Consent Order.  There the DFS found that, had it been aware of the extent of the changes that were due to occur as a result of the implementation of the volatility-management strategy, "it may have required that the existing [variable annuity] policyholders affirmatively opt in to the [ ] strategy." (Consent Order ¶ 9 (emphasis added).)  This hardly requires the Court to read Shuster's Complaint to allege that, "had [the] alleged misrepresentations to [DFS] not been made, and had the [DFS] not allegedly been misled, [DFS] would have required that [Shuster] have been presented with a qualitatively different investment choice when volatility management was introduced." (Def.'s Opp'n at 21-22.)  At most, the Consent Order suggests that one course of action DFS might have taken in response to a properly filed notice with respect to the volatility-management strategy would be to require that the policyholders affirmatively adopt the volatility-management strategy.  The Consent Order does not use the words "must," "would," "probably," or even "likely."  And while it suggests that the DFS may have considered putting the decision to implement the volatility-management strategy into the hands of the policyholders, it does not state that DFS might have required the policyholders to opt-in to the Affected Funds or choose different investment funds altogether.  The Court cannot abide by AXA's attempt to twist speculative dicta in the Consent Order into a binding declaration that ought to rewrite Shuster's Complaint.

Viewed more broadly, it is clear that AXA reads Shuster's Complaint too narrowly. In support of its reading of the breach of contract claim, AXA argues that to prove damages, Shuster <u>must</u> allege that she would have changed her investments from the Affected Funds to some other investments in the Separate Account had Shuster known about the volatility-management strategy. (Def.'s Sur-Rep. at 3.)[14] Yet, how is this the only way for Shuster to prove damages? If the class were to show that AXA never would have implemented the volatility-management strategy in the first instance had it been prepared to actually notify the DFS in the event that it intended to implement such a strategy, the damages would be measured by how the Affected Funds would have performed without the volatility-management strategy.[15] Similarly, the class could show that the DFS would have rejected the proposed changes outright. Under these theories, there would be no need to assume what would have happened if the class members had faced a decision to hold on to or change their investments in the Affected Funds. AXA may wish to construe the Complaint as one that asks what would have happened had AXA been forthright with DFS in the first place,[16] but the Court cannot ignore that Shuster's Complaint could just as readily be asking what would have happened had AXA not implemented the volatility-management strategy at all. For all of these reasons, the Court finds the first <u>Rowinski</u> consideration weighs in favor of Shuster.

---

[14] Interestingly, AXA points out that Shuster elected to allocate some of her investment monies <u>into</u> volatility-managed funds <u>after</u> the strategy was introduced. (Def.'s Opp'n at 21 n.13 (citing Ex. 4 to Muscato Cert.).)

[15] Moreover, this damage number may be far easier to ascertain than the amount each class member would have expected to receive by investing their proceeds in something other than the Affected Funds once they learned that AXA intended to implement a volatility-management strategy for those funds.

[16] Even this reading of the Complaint requires additional leaps to assume that the class members would have necessarily faced a decision concerning what to do with their investment accounts; AXA's filings with the DFS were not public, and the course of action that might have been taken by the DFS had it known about the volatility-management strategy is far from certain. As mentioned above, the DFS may have rejected AXA's proposed changes altogether.

Next, the Court considers whether the Complaint alleges "a material misrepresentation or omission disseminated to the public in a medium upon which a reasonable investor would rely." Rowinski, 398 F.3d at 302 (quoting Semerenko, 233 F.3d at 176). As noted by Shuster, the DFS filings were not public, and there is no indication that they would be made public without following AXA's tenuous string of logic discussed above. This provides little support for finding that the "in connection" prong has been met.

While the nature of AXA's relationship with the members of the class did not necessarily involve the purchase or sale of covered securities, see Rowinski, 298 F.3d at 302, the claims in this case do relate entirely to that aspect of AXA's relationship with the holders of variable life insurance policies. Therefore, the Court considers this Rowinski factor to favor AXA's position.

Finally, the Court asks whether Shuster's prayer for relief "connects the state law claims to the purchase or sale of securities." Id. As discussed above, not necessarily. Examining what would have happened "if performance had been rendered as promised," Donovan v. Bachstadt, 91 N.J. 434, 444 (1982), might involve asking what would have happened if AXA had decided against implementing the volatility-management strategy, or if the DFS had rejected AXA's proposed change outright. The speculative nature of any connection between Shuster's prayer for relief and the purchase or sale of securities weighs against AXA on this point.

While SLUSA preemption is interpreted broadly, the Court will not go beyond a reasonable reading of the allegations in the Complaint and the facts underlying the breach of contract claim to find that this action is precluded by SLUSA. Though a misrepresentation appears to be a material element of the claim, there is simply no indication that it was a misrepresentation made in connection with the purchase or sale of covered securities. The factors set forth in Rowinski weigh heavily in favor of Shuster's position, and only AXA's

19

speculations suggest otherwise. Therefore, the Court finds that AXA has failed to satisfy its required showing in order to remove and dismiss this action pursuant to SLUSA, and remand is required.

The Court will remand this action to the Superior Court of New Jersey, Law Division, Camden County.

**IV.     CONCLUSION**

For the foregoing reasons, Shuster's Motion for Remand will be **GRANTED**. Shuster's Complaint will be remanded to the Superior Court of New Jersey, Law Division, Camden County. An accompanying Order shall issue.


Dated:     7/14/2015                                       s/ Robert B. Kugler
                                                                              ROBERT B. KUGLER
                                                                              United States District Judge